# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively and on Behalf of AMERICAN INTERNATIONAL GROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT B. WILLUMSTAD, MICHAEL SUTTON, STEPHEN F. BOLLENBACH, GEORGE L. MILES, MORRIS W. OFFIT, JAMES F. ORR III, FRED H. LANGHAMMER, MARTIN FELDSTEIN, VIRGINIA ROMETTY, SUZANNA NORA JOHNSON, ELLEN V. FUTTER, RICHARD C. HOLBROOKE, EDMUND S.W. TSE, MARTIN J. SULLIVAN, STEVEN BENSINGER, JOSEPH CASSANO, ANDREW FORSTER, AND ROBERT LEWIS, <br><br> Defendants, <br><br> and <br><br> AMERICAN INTERNATIONAL GROUP, INC., <br><br> Nominal Defendant. | Case No. 08-cv-7019 (CM) <br><br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br><br> **Jury Trial Demanded** |

Plaintiff, by its undersigned attorneys, submits this Shareholder Derivative Complaint ("Complaint") against each of the individual Defendants ("Defendants") named herein and, nominally, against American International Group, Inc. ("AIG" or the "Company").

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by the Louisiana Municipal Police Employees' Retirement System (the "Retirement System"), a large institutional investor who

purchased and continues to hold the common stock of AIG.  The action is brought on behalf of the Company against certain of its directors and officers for the substantial damages caused to the Company as a result of Defendants' illegal and improper conduct beginning on December 5, 2007 and continuing until the present (the "Relevant Period").  Defendants caused this harm to AIG as a result of the Board of Directors': (i) breaches of their fiduciary duties; (ii) waste of Company assets; (iii) abuse of control and gross mismanagement of AIG; (iv) unjust enrichment at the expense of the Company; and (v) violations of the Securities Exchange Act of 1934 (the "Exchange Act") and other federal and state securities laws.

2.    As a result of Defendants' illegal and improper conduct, AIG has been caused to lose over $100 billion of its market capitalization, it has been forced to record over $20 billion in losses and asset impairment charges, it has allowed Defendants to reap hundreds of millions of dollars in unearned bonus and severance payments, and it has caused damage to the Company's reputation and good will.

## SUMMARY OF THE ACTION

3.    By late fall 2007 the nation's leading brokerage firms and largest banks had already announced tens of billions of dollars in losses and almost $50 billion in write-downs related to structured finance and derivative subprime-related mortgage assets.  At that time, these banks and brokerages announced thousands of layoffs with more scheduled.  According to a media report, by mid-November 2007, the destruction of shareholder wealth was "staggering."  In fact, according to reports, by that time, a dozen of the biggest Wall Street firms and the commercial banks with the largest investment arms -- a list that includes Bank of America, J.P. Morgan Chase and Credit Suisse -- had lost more than $240 billion in market value.

4.      In fact, by the end of November 2007, the nation's largest investment and commercial banks had *already* taken tens of billions of dollars in write-downs related to their structured finance products. The largest of these write-offs by that time included: (i) Citigroup - $9.8 billion;  (ii) Merrill Lynch - $7.9 billion; (iii) UBS - $4.4 billion; (iv)   Morgan Stanley - $3.7 billion; (v) Wachovia- $2.1 billion; and (vi) Bank of America - $3.527 billion.  In addition to the foregoing, by mid-December 2007, Bear Stearns announced a $1.9 billion write-down, and by mid-January 2008, Citigroup announced that it had taken an $18 billion charge related to subprime-related costs, in addition to slashing its dividend by 41%.  Days after Citigroup announced its massive charges, Merrill Lynch also announced an additional $14.1 billion in subprime-related losses, bringing its total then to approximately $23 billion, and causing a loss of $9.83 billion for 4Q:07.

5.      It was against this background, therefore, that the statements regarding AIG's derivatives portfolio exposure and risk of loss made by Defendants at the Company's impromptu December 5, 2007 Presentation were of critical importance to investors.  These statements guided investors to believe that  -- unlike its many competitors who were also involved in the subprime mortgage credit derivatives and financial services markets, and who had *already* taken massive charges by the end of 2007 -- AIG exited the subprime mortgage market as early as the end of 2005 and, therefore, AIG did not have large exposure to losses related to subprime mortgages.

6.      The presentation on December 5, 2007 – referred to herein as the "December 5, 2007 Investor Presentation" or the "Presentation" – lasted nearly *five hours* and produced almost 100 pages of transcript.  Consistently throughout the December 5, 2007 Presentation, defendant Sullivan and other senior managers of the Company – on behalf of the Company at the direction, and with the knowledge and consent, of all Defendants – specifically stated that Defendants were "confident" in

how AIG valued its derivatives portfolio, and that AIG's exposure to risk of loss on such investments was **"***manageable*.**"

7.      In addition to a series of other statements designed to mislead investors as to the true financial and operational condition of the Company, at the December 5, 2007 Presentation, Defendants stated, or caused or allowed to be stated, in part, the following:

*      That AIG was distinguished from its competitors, which had much larger sub-prime related exposure, because ***Defendants utilized highly effective risk controls and monitoring procedures which were sufficient and effective and which foreseeably would continue to insulate AIG from massive losses or liquidity***.

*      That Defendants had ***limited AIG's exposure to mortgage related losses by effectively abandoning this market in late-2005*** after which Defendants caused the Company to modify the form of its exposure by "moving to higher quality and shorter duration" instruments.

*      That management and the Board continued to endorse a five-year goal to grow adjusted earnings per share from 10% to 12% per year, primarily through organic growth, and that it was reasonable to expect adjusted returns on equity of approximately 15% to 16% over the same five-year time period.

*      That it was reasonably foreseeable that AIG would continue to operate according to plan – just as it had over the past 30 months – and that at that time, the Company was able to "generate strong profitability, in many cases when others did not."

8.      Defendants also used the December 5, 2007 Presentation to guide investors to believe that AIG's losses were limited to approximately $1.3 billion related to its derivatives portfolio, and to rationalize why it was proper for Defendants and the Board to ignore the red flags that indicated Defendants' assumptions were not correct.

9.      Unbeknownst to investors, however, and as the public would eventually discover, at the time of the December 5, 2007 Presentation, AIG was the counterparty on credit default swaps covering at least *$527 billion* in potential defaults -- including over $78 billion linked to potential defaults of collateralized debt obligations as of December 31, 2007. As investors would only learn

in June 2008, however, these derivative instruments had *already* suffered impairments that would result in tens of billions of dollars in write-offs, and would create a liquidity crisis that would cause AIG to dilute investors by selling over $20 billion of additional new equity.

10.      As investors have now discovered, Defendants' statements during the December 5, 2007 Presentation were materially false and misleading and violated federal securities laws because Defendants knew but failed to disclose that they had caused AIG to secretly employ an improper valuation methodology to value the Company's Credit Default Swaps.  Thus, for purposes of the December 5, 2007 Presentation only, Defendants caused AIG to employ a valuation methodology that gave maximum effect to certain accounting techniques known as cash flow diversion features ("CDFs") and negative basis adjustments ("NBAs") --  a methodology never before used by AIG, and never used again.

11.      In fact, despite admitting in the Company's 3Q:07 Form 10-Q, filed with the SEC in early November 2007, that Defendants could not reliably employ CDFs or NBAs to calculate the correct values of the CDS portfolio, when the Company filed its Form 8-K on February 11, 2008, Defendants admitted that these techniques had been used to value the portfolio for purposes of the December 5, 2007 Presentation.

12.      Only one inference is possible from Defendants' manipulation of the valuation techniques: that Defendants' stated values for the CDS portfolio at the December 5, 2007 Presentation had no reasonable basis in fact and were known by Defendants to be false at that time, or the falsity of such statements was recklessly regarded by management and the Board.

13.      Moreover, it is now also obvious that the Board caused or allowed AIG to wait until mid-February 2008 to begin to reveal the true financial and operational condition of the

Company -- as opposed to revealing the impaired condition of the credit default swaps and investments during the December 5, 2007 Investor Presentation -- because this allowed management and the Board to finish the 2007 performance reviews that were purportedly scheduled to occur in January 2008, before the time that AIG was caused to reveal the impaired condition of the Company. Postponing the disclosure of even the first of the subprime-related derivatives charges until after the 2007 performance reviews caused and allowed the Compensation Committee and the Board to pay millions of dollars in unearned performance bonuses to senior officers of AIG, certain of whom were also then Board members of the Company.

14.    Thus, it was only beginning in February 2008 -- just weeks after the December 5, 2007 Presentation -- that Defendants began to issue a string of press releases which slowly began to disclose the huge -- $20 billion -- impairment to the Company's derivatives portfolio in addition to a credit crisis that would cause AIG to be forced to sell at least $20 billion in new, dilutive equity. Thus, on February 11, 2008, Defendants revealed that it would take a $4.88 billion charge in 4Q:07. Then, on February 29, 2008, when Defendants actually caused the Company to report results, this was raised to a $5.3 billion quarterly loss in addition to an $11.1 billion charge to AIG's derivatives portfolio.

15.    In early May 2008, when Defendants caused AIG to report results for 1Q:08, these losses skyrocketed to $7.81 Billion with an additional $12.5 Billion Charge for Derivatives and a total write-down of $15.95 billion. Moreover, by the end of May 2008, as a result of the liquidity crisis that had adversely impacted the Company since at least the inception of the Relevant Period, Defendants announced that they would cause AIG to sell at least $20 billion of new equity -- the effect of which would be at least a 10% earnings dilution for then current shareholders.

16.    In addition to the instant action, as a direct result of Defendants' publication of materially false and misleading statements about the Company, by the end of May 2008, a public pension fund in Florida also filed suit against AIG and certain of its officers and directors. This suit, filed in this District as a class action, alleges violations of the federal securities laws on behalf of a class of investors who purchased shares of the Company on the New York Stock Exchange. By early June 2008, the SEC and DOJ also announced investigations into the Company for possible criminal activity.

17.    Unlike the investors who suffered massive losses as a result their illegal and improper behavior, Defendants took advantage of the weakened condition of the Company to entrench and enrich themselves and to advance their own personal interests at the expense of the public shareholders and the Company. As evidence of this, in mid-June 2008, not only was defendant Sullivan allowed to retire for his own "Good Reason" -- a designation that allowed him to realize over $35 million in unearned severance payments -- but defendant Willumstad was also allowed to re-consolidate the offices of Chairman and Chief Executive Officer -- a move that gave total control over the AIG back to the Board of Directors of the Company. In connection with this purported appointment, defendant Willumstad was also given bonuses and options grants valued at approximately $40 million.

18.    In addition to the serious breaches of many important fiduciary duties outlined herein, and in addition to the securities fraud action filed against the Company; the SEC and DOJ investigations now pending; and the total loss of confidence in AIG's management and its Board -- the price of Company shares has been decimated under Sullivan's stewardship. The chart below

evidences the dramatic decline in the price of AIG's shares from the inception of the Relevant

Period, on December 5, 2007, until July 1, 2008, as follows:



*This share price decline amounted to the **eviscceration of almost $100 billion** of AIG's market*

*capitalization -- or over 62% of AIG's total market value.*

19.　　As a result of the foregoing, demand upon the Board of AIG to institute this action in

the Company's name would be entirely futile, and is therefore excused.  Evidence of the individual

Board Members' conflicts of interest and their lack of independence are presented, in specific detail

herein, and detailed in paragraphs 171 to 179, *infra*.

## JURISDICTION AND VENUE

20.　　This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28

U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that

they form part of the same case or controversy.  This Court also has jurisdiction over all claims

asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the Retirement System and each of the Defendants and the amount in controversy exceeds $75,000.

21.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) AIG maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

23.    Plaintiff Retirement System is, and was during the Relevant Period, an owner and holder of the common stock of AIG.  The Retirement System is an instrumentality of the State of Louisiana and a resident thereof.

### Nominal Defendant

24.    Nominal defendant AIG is a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 70 Pine Street in New York City, New York. AIG, through its subsidiaries, provides insurance and financial services in the United States and internationally, operating in four segments: (i) General Insurance; (ii) Life Insurance and Retirement Services; (iii) Financial Services; and (iv) Asset Management. The General Insurance segment

underwrites various business insurance products, including large commercial or industrial property insurance, excess liability, and related products and excess and umbrella coverage. The Life Insurance and Retirement Services segment offers individual and group life, payout annuities, endowment, and accident and health policies, as well as retirement savings products consisting of fixed and variable annuities. The Financial Services segment provides aircraft and equipment leasing, capital market transactions, consumer finance, and insurance premium financing. The Asset Management segment provides investment-related services and investment products.

**Individual Defendants**

25.    Defendant Robert B. Willumstad ("Willumstad") is the Chairman of the Board of Directors of AIG (the "Board") and has served in that capacity since November 2006. Following the departure of Martin Sullivan on or about June 15, 2008, Willumstad became CEO of the Company. Willumstad serves as an *ex-officio* member of *all six* separate committees of the Board: Audit; Nominating and Corporate Governance; Compensation and Management Resources; Finance; Public Policy and Social Responsibility; and Regulatory, Compliance and Legal. In exchange for his purported trust, loyalty, and fidelity to AIG, Willumstad in 2007 was paid over $435,000 in fees, stock awards, and other compensation. Moreover, in connection with his consolidation of the offices of CEO and Chairman of the Board, Willumstad, awarded himself one-time grants, options, and other emoluments valued at over $40 million at AIG's expense. Willumstad is a resident of the State of New York.

26.    Defendant Michael Sutton ("Sutton") has served as a member of the Board since 2005. In addition, he is the Chairman of the Audit Committee and a member of the Regulatory, Compliance and Legal Committee of the Board. In exchange for his purported trust, loyalty, and

fidelity to AIG, Sutton was paid over $300,000 in fees, stock awards and other compensation in 2007. Sutton is a resident of the Commonwealth of Virginia.

27.     Defendant Stephen F. Bollenbach ("Bollenbach") has served as a member of the Board since January 16, 2008 and is a member of the Audit Committee of the Board. Bollenbach is a resident of the State of California.

28.     Defendant George L. Miles ("Miles") has served as a member of the Board since 2005, is the Chairman of the Nominating and Corporate Governance Committee, and is a member of the Audit Committee and the Public Policy and Social Responsibility Committee. In exchange for his purported trust, loyalty, and fidelity to AIG, Miles in 2007 was paid almost $300,000 in fees, stock awards and other compensation. Miles is a resident of the Commonwealth of Pennsylvania.

29.     Defendant Morris W. Offit ("Offit") has served as a member of the Board since 2005, is Chairman of the Finance Committee and is a member of the Audit Committee and the Public Policy and Social Responsibility Committee. In exchange for his purported trust, loyalty, and fidelity to AIG, Offit was paid over $300,000 in fees, stock awards and other compensation in 2007. Offit personally attended the December 5, 2007 Investor Presentation on behalf of the Board. Offit is a resident of the State of New York.

30.     Defendant James F. Orr III ("Orr") has served as a member of the Board since 2006 and is a member of the Nominating and Corporate Governance Committee and the Compensation and Management Resources Committee. In exchange for his purported trust, loyalty, and fidelity to AIG, Orr was paid almost $270,000 in fees, stock awards and other compensation in 2007. Orr is a resident of the State of Florida.

31.     Defendant Fred H. Langhammer ("Langhammer") has served as a member of the Board since 2006 and is a member of the Compensation and Management Resources Committee and the Finance Committee. In exchange for his purported trust, loyalty, and fidelity to AIG, Langhammer was paid over $278,000 in fees, stock awards and other compensation in 2007. Langhammer is a resident of the State of Connecticut.

32.     Defendant Martin S. Feldstein ("Feldstein") has served as a member of the Board of Directors of the Company since 1987 and is a member of the Finance Committee and the Regulatory, Compliance and Legal Committee. In exchange for his purported trust, loyalty, and fidelity to AIG, Feldstein was paid over $254,000 in fees, stock awards and other compensation in 2007. Feldstein is a resident of the Commonwealth of Massachusetts.

33.     Defendant Virginia M. Rometty ("Rometty") has served as a member of the Board since 2006, and is a member of the Compensation and Management Resources Committee. In exchange for her purported trust, loyalty, and fidelity to AIG, Rometty was paid over $254,000 in fees, stock awards, and other compensation in 2007. Rometty is a resident of the State of Florida.

34.     Defendant Suzanne Nora Johnson ("Johnson") has served as a member of the Board since July 16, 2008. Johnson is a resident of the State of California.

35.     Defendant Ellen V. Futter ("Futter") has served as a member of the Board since 1999. She is a member of the Nominating and Corporate Governance Committee and the Regulatory, Compliance and Legal Committee. In exchange for her purported trust, loyalty, and fidelity to AIG, Futter was paid over $263,000 in fees, stock awards, and other compensation in 2007. Futter is a resident of the State of New York

36.     Defendant Richard C. Holbrooke ("Holbrooke") has served as a member of the Board since 2001.  He is Chairman of the Public Policy and Social Responsibility Committee.  In exchange for his purported trust, loyalty, and fidelity to AIG, Holbrooke was paid over $267,000 in fees, stock awards, and other compensation in 2007.  Holbrooke is a resident of the State of New York.

37.     Defendant Edmund S.W. Tse ("Tse") is the Senior Vice Chairman—Life Insurance of the Company.  Tse has served as a member of the Board since 1996.  In exchange for his purported trust, loyalty and fidelity to AIG, Tse received *ten million dollars* from AIG in 2007.  The hoard transferred to Tse broke down as follows:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|-------|
| 2007 | $ 848,776 | $ 1,863,963 | $ (470,227 ) | $ 2,597,852 | $ 4,950,546 | $ 9,988,625 |

Tse is a resident of the State of New York.

38.     Defendant Martin J. Sullivan ("Sullivan") served as CEO of the Company between 2005 and June 2008.  He was a member of the Board between 2002 and June 2008, and was a member of the Finance Committee during the time of the events complained of.  On or about June 16, 2008, Sullivan was terminated from AIG.  In exchange for his purported trust, loyalty, and fidelity to AIG, in 2007 alone, Sullivan received *over fourteen million dollars* from AIG.  The hoard transferred to Sullivan broke down as follows:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|---|-------|
| 2007 | $ 1,000,000 | $ 3,625,000 | $ 921,876 | $ 2,448,490 | $ 5,607,439 | $ | 14,330,736 |

In connection with his termination from the Company, Defendants showered Sullivan with purported severance and bonus payments totaling approximately $47 million. This was in addition to the more than $40 million in transfers to Sullivan since becoming CEO in 2005. Sullivan is a resident of the State of New York.

39.     Defendant Steven Bensinger ("Bensinger") is Vice Chairman of AIG's Financial Services division, having assumed this position on or about May 8, 2008. Prior thereto, Bensinger served as Chief Financial Officer ("CFO") beginning in March 2005, as Senior Vice President and Comptroller beginning in January 2005, and as Treasurer beginning in October 2002. In exchange for his purported trust, loyalty and fidelity to AIG, Bensinger received *nearly seven million dollars* from AIG in 2007. The hoard transferred to Bensinger broke down as follows:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------|-------------|--------------|----------------------------------------|-------|
| 2007 | $ 751,923 | $ 1,450,000 | $ 598,408 | $ 860,637 | $ 2,786,927 | $   6,596,212 |

Bensinger is a resident of the State of New York.

40.     Defendant Joseph Cassano ("Cassano") was, until early 2008, President and CEO of AIG Financial Products, a division of AIG. Upon information and belief, Cassano is a resident of the State of Connecticut.

41.     Defendant Andrew Forster ("Forster") is the head of AIG's Asset Trading and Credit Products division. Upon information and belief, Forster is a resident of the State of New York.

42.     Defendant Robert Lewis ("Lewis") is the Senior Vice President and Chief Risk Officer of AIG. Upon information and belief, Lewis is a resident of the State of New York.

43.     The Defendants who currently serve on AIG's Board named in paragraphs 25 to 37 hereof are referred to as the "Director Defendants."  The Defendants who were officers of the Company during the events complained of, named in paragraphs 25, 37, and 38 to 42 hereof, are referred to as the "Officer Defendants."  (There is some overlap between these two groups of Defendants.)

### DUTIES OF THE INDIVIDUAL DEFENDANTS & BOARD OF DIRECTORS

44.     Defendants had stringent duties to AIG and its shareholders.  These duties arose by operation of law and were imposed upon them by the Company, by virtue of their positions at the Company.

### Duties at Law

45.     By reason of their positions as officers, directors, and/or fiduciaries of AIG and because of their ability to control the business and corporate affairs of AIG, the Defendants owed AIG and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AIG in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of AIG and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

46.     Each director and officer of the Company owes to AIG and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information should be either disclosed or not disclosed in the Company's public statements.

47.      The Defendants, because of their positions of control and authority as directors and/or officers of AIG, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with AIG, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of AIG.

48.      To discharge their duties, the officers and directors of AIG were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AIG were required to, among other things:

(a)      refrain from acting in any manner so as to favor the personal interest of the Directors or Officers of the Company at the expense of the best interest of the Company and its shareholders;

(b)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(d)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)      ensure that management was not employing abstract models that were designed to support predetermined conclusions and that were so complex that they allowed these insiders (whose very compensation depended upon the valuation of such assets) to cause AIG to ignore obvious "red flags" and warning signs, and to then dismiss the anomalies that were demonstrating that these models were failing;

(f)      ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets or loan collateral;

(g)      remain informed as to how AIG conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(h)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(i)      ensure that sufficient checks and balances in AIG's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, overstatement of revenue, material overstatement of prepaid royalties,  and material understatement of deferred income and accrued royalty accounts;

(j)      ensure that no inaccurate financial information about AIG was released to the public that would tend to artificially inflate AIG's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(k)      ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the Company, or to the Board members who took advantage of the crisis they created to entrench themselves and consolidate their power and control over AIG, or to reap tens of millions of dollars in improper bonus payments or compensation awards.

49.      Each Defendant, by virtue of his or her position as a director and/or officer of AIG, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AIG, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or

directors of the Company during the relevant period has been ratified by the remaining Defendants who collectively comprised all of AIG's Board during the relevant period.

50.    In addition to the general duties recited above, the members of the Board of Directors also assumed specific duties and responsibilities to the outside shareholders of the Company as a result of their Board or Committee positions.  These specific duties are outlined in the Company's Proxy Statement and Corporate Governance Guidelines, its Code of Conduct and in the specific Committee Charters.

### Duties Stated in AIG's 2008 Proxy Statement

51.    The Company's 2007 Proxy Statement defines the duties and responsibilities of the officers and directors of AIG, in part, as follows:

- Members of the Audit Committee are "directly responsible" for the appointment, compensation, retention and oversight of the work of AIG's independent registered public accounting firm and, in its oversight of AIG's internal audit function, the Audit Committee also is responsible for the review of performance and determination of compensation for AIG's auditors.

- Members of the Nominating and Corporate Governance Committee are responsible for reviewing and recommending individuals to the Board of Directors for nomination, election or appointment as members of the Board and its committees, to advise the Board on corporate governance and to oversee the evaluation of the Board and its committees.

- Members of the Regulatory, Compliance and Legal Committee are charged with assisting the Board in its oversight of AIG's legal, regulatory and compliance matters.

- Members of the Finance Committee are charged with assisting the Board in its oversight responsibilities by reviewing and making recommendations to the Board with respect to AIG's financial and investment policies, and to provide strategic guidance to management as to AIG's capital structure, use of capital in its businesses, methods of financing its businesses and other related strategic initiatives. The Committee also assists the Board in its oversight responsibilities with respect to AIG's risk management processes insofar as they relate to matters considered by the Committee pursuant to its charter.

- The Compensation and Management Resources Committee responsible for reviewing and approving the compensation awarded to AIG's CEO (subject to ratification by the Board) and to the other key employees under its purview, including the performance measures and goals relevant to that compensation.

- Members of the Public Policy and Social Responsibility Committee are responsible for reviewing the position and policies of AIG relating to current and emerging corporate social responsibility and political and public policy issues of significance to AIG, that may affect AIG's business operations, performance or corporate reputation.

52.     In addition to the foregoing, the 2007 Proxy further specifies the duties and responsibilities of each member of the Audit Committee of the Board of Directors of the Company, in part, as follows:

### REPORT OF THE AUDIT COMMITTEE

Management is responsible for the preparation, presentation and integrity of AIG's financial statements, for its accounting and financial reporting principles and for the establishment and effectiveness of internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for performing an independent audit of the financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), expressing an opinion as to the conformity of such financial statements with generally accepted accounting principles and expressing an opinion on the effectiveness of internal control over financial reporting. The independent auditors have free access to the Audit Committee to discuss any matters they deem appropriate. During 2007, the PricewaterhouseCoopers LLP engagement team spent a significant amount of time with the Audit Committee.

Committee Organization and Operation

The Audit Committee's function is to assist the Board of Directors in its oversight of:

- The integrity of AIG's financial statements;

- AIG's internal control over financial reporting;

- AIG's compliance with legal and regulatory requirements;

- The independent accountants' qualifications, independence and performance; and

- The performance of AIG's internal audit function.

**Duties Defined in AIG's Corporate Governance Guidelines**

53.    Attached to the Company's 2007 Proxy Statement, and also maintained on the Company's Internet website, AIG maintained and updated Corporate Governance Guidelines which further specified Defendants' fiduciary duties and responsibilities to AIG and its shareholders, in part, as follows:

AMERICAN INTERNATIONAL GROUP, INC.
CORPORATE GOVERNANCE GUIDELINES

II.    ROLES OF BOARD AND MANAGEMENT

The business of AIG is conducted by management under the oversight of the Board. The roles of the Board and management are related, but distinct. AIG's business strategy is developed and implemented under the leadership and direction of the Chief Executive Officer by its officers and other employees. The members of the Board serve as the elected representatives of the current and future shareholders, act as advisers and counselors to the Chief Executive Officer and senior management and oversee management's performance on behalf of the shareholders. In performing its general oversight function, the Board reviews and assesses AIG's strategic and business planning as well as management's approach to addressing significant risks and challenges facing AIG. As part of this function, the Board reviews and discusses reports regularly submitted to the Board by management with respect to AIG's performance, as well as significant events, issues and risks that may affect AIG's business or financial performance. In performing its oversight function, the Board and its members will maintain frequent, active and open communication and discussions with the Chief Executive Officer and the management of AIG.

*    *    *

IV.    THE CHAIRMAN OF THE BOARD

A.    *Selection of the Chairman.* The Board will select its Chairman in the manner it considers to be in the best interests of AIG at any given point in time.

- 21 -

The selection of the Chairman will be reviewed annually. In connection with this review, the Nominating and Corporate Governance Committee will conduct an independent evaluation of the Chairman.

B.    *Duties of the Chairman.* The Chairman will have the duties assigned by the Board. It is the Board's current policy that the Chairman's duties include chairing meetings of the Board and overseeing the process of informing the Board through timely distribution of information and reports.

V.    LEAD INDEPENDENT DIRECTOR

A.    *Selection of the Lead Independent Director.* If the Chairman is not an Independent Director, the Independent Directors shall annually select from among their number a Lead Independent Director. Under normal circumstances, the same individual should not serve as Lead Independent Director for more than five consecutive years.

B.    *Duties of the Lead Independent Director.* The Lead Independent Director will have the duties assigned by the Independent Directors or set forth in the By-laws. It is the Independent Directors' current policy that the Lead Independent Director's duties shall include:

• Serving as an *ex-officio*, non-voting member of each standing committee of the Board of each committee of which he is not a member…; and

• Leading the Board in the process of periodic reviews of the performance of the Chief Executive Officer, as well as in discussions regarding the Chief Executive Officer's reports on senior management performance and management succession issues and plans.

54.    In addition to providing the Board with the authority to retain, if appropriate, independent legal, accounting, and other advisors to assist the Board (or, when appropriate the Independent Directors) at the expense of the Company, the Corporate Governance Guidelines also specify the Board members' responsibilities, in part, as follows:

XI.    BOARD RESPONSIBILITIES

A.    Overall Business Strategy. The Board will periodically review and approve AIG's overall strategic and business plans.

\*    \*    \*

D.    Evaluating and Approving Compensation for the Chief Executive Officer. The Board, acting through the Compensation and Management Resources Committee, evaluates the performance of the Chief Executive Officer against AIG's goals and objectives and determines the compensation of the Chief Executive Officer. The determination of the Compensation and Management Resources Committee with respect to the Chief Executive Officer's compensation shall be subject to the approval or ratification of the Board as provided in the by-laws.

\*    \*    \*

XII.    EXPECTATIONS OF DIRECTORS

The business and affairs of AIG are to be managed by or under the direction of the Board in accordance with the laws of the State of Delaware. In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of AIG. The Board has developed a number of specific expectations of directors to promote the discharge of this responsibility and the efficient conduct of the Board's business.

\*    \*    \*

C.    Loyalty and Ethics. In their roles as directors, all directors owe a duty of loyalty to AIG. This duty of loyalty mandates that the best interests of AIG take precedence over any interests possessed by a director.

AIG has adopted a Director, Executive Officer and Senior Financial Officer Code of Business Conduct and Ethics. Directors should be familiar with the Code's provisions and should consult with AIG's Vice President – Corporate Governance and Special Counsel and Secretary to the Board of Directors in the event of any issues that arise with respect to the matters set forth in the Code.

**Duties Described in AIG's Code of Conduct**

55.    The duties of loyalty, trust, and honesty are also reinforced by the requirements of the

Company's Code of Conduct, also available on the Company's website.  In addition to the

foregoing, the Code of Conduct specifies the duties and responsibilities of AIG's Directors,

Executive Officer, and Senior Financial Officer, in part, as follows:

I.      Introduction

This Code of Business Conduct and Ethics ("Code") embodies the commitment of American International Group, Inc. and its subsidiaries (collectively, "AIG") to conduct its business with the highest ethical standards and in accordance with all applicable laws, rules and regulations of the countries in which AIG engages in business. All members of the Board of Directors, executive officers, and senior financial officers are expected to adhere to the principles and procedures set forth in this Code. Directors, executive officers, and senior financial officers that are also AIG employees are also required to abide by AIG's Employee Code of Conduct, which is not part of this Code.

II.     Honest and Candid Conduct

Each director, executive officer, and senior financial officer owes a duty to AIG to act with integrity. Integrity requires, among other things, being honest and candid.

III.    Conflicts of Interest

A "conflict of interest" occurs when an individual's private interest interferes with the interests of AIG. A conflict of interest can arise when a director, executive officer, or senior financial officer takes actions or has interests that may make it difficult to perform his or her AIG work objectively and effectively. In particular, a director, executive officer, and senior financial officer must never use or attempt to use his or her position at AIG to obtain any improper personal benefit, including loans or guarantees of obligations from any person or entity, for himself or herself, for his or her family members, or for any other person. Situations which could result in conflicts of interest or the appearance of a conflict of interest should be avoided whenever possible.

Any director, executive officer, or senior financial officer who is aware of a transaction or relationship that could reasonably be expected to give rise to a conflict of interest should discuss the situation with AIG's General Counsel.

*     *     *

VIII.   Fair Dealing

AIG does not seek competitive advantages through illegal or unethical business practices. Each director, executive officer, and senior financial officer should endeavor to deal fairly with AIG's customers, service providers, suppliers,

competitors, and employees. No director, executive officer, or senior financial officer should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

*    *    *

X.    Compliance with Laws, Rules and Regulations

*General Compliance.* It is AIG's policy to comply with all applicable laws, rules and regulations in the countries in which AIG engages in business. It is the personal responsibility of each director, executive officer, and senior financial officer to adhere to the standards and restrictions imposed by those laws, rules, and regulations.

XI.    Senior Financial Officers

Application. For the purpose of this Code, "senior financial officer" means the chief executive officer, chief financial officer, and comptroller of AIG and the chief financial officer and comptroller of each significant AIG subsidiary.

Standards. All senior financial officers shall:

A.    Be familiar and comply with AIG's disclosure controls and procedures and internal controls over financial reporting to the extent relevant to his or her area of responsibility, so that AIG's reports, other documents filed, or submitted or furnished to the Securities and Exchange Commission ("SEC") comply in all material respects with applicable federal securities laws and SEC rules and regulations;

B.    Provide full, fair, accurate, timely, and understandable disclosures in reports and documents that are filed with, or submitted or furnished to the SEC and other governmental agencies and in other public communications;

C.    Provide full, fair, accurate, timely, and understandable information, without misrepresenting or causing others to misrepresent, material facts about AIG to AIG's independent auditors; and

D.    Comply with laws, rules and regulations of national, state, provincial, and local governments and other appropriate regulatory agencies and self-regulatory bodies.

*    *    *

XIII. Compliance with this Code and Reporting

Directors, executive officers, and senior financial officers should strive to identify and raise potential issues before they become problems and should ask about the application of this Code whenever in doubt. Any director, executive officer, or senior financial officer who becomes aware of any existing or potential violation of this Code shall promptly notify AIG's General Counsel. AIG will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention, including notifying the appropriate enforcement authorities in the event of criminal or other violations of law….

## Duties Described in AIG's Audit Committee Charter

56.     The Charter of the Audit Committee specified additional duties and responsibilities of

each member of the Audit Committee, in part, as follows:

II.     Responsibilities

AIG's business is managed under the oversight of the Board and the various committees of the Board, including the Committee. The primary responsibility of the Committee is to exercise its business judgment in carrying out the responsibilities described in this Charter in a manner the Committee  members believe to be in the best interests of AIG and its shareholders.

\*     \*     \*

VI. Financial Disclosure

B.     The Committee shall generally discuss the type and presentation of information to be
included in earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. It is not expected that the Committee will pre-approve each such release or guidance. The Committee shall discuss AIG's quarterly earnings press releases with management and the independent auditor prior to public release.

C.     The Committee shall discuss generally with management and the independent auditor the annual audited financial statements and the quarterly financial statements, including AIG's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations". The Committee shall also review AIG's disclosure controls and procedures with management on a quarterly basis. The Committee shall recommend to the Board whether the audited financial statements should be included in AIG's Annual Report on Form 10-K.

D.    The Committee shall discuss with management, the internal auditors, and the independent auditor major issues regarding accounting principles and financial statement
presentations, including (1) any significant change in AIG's selection or application of accounting principles, (2) any major issues relating to the adequacy of AIG's internal controls, (3) any audit steps adopted in light of material control deficiencies, (4) the effect of regulatory and accounting initiatives on AIG's financial statements, (5) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of AIG's financial statements and (6) any fraud, material or otherwise, that involved management or other employees who have a significant role in AIG's internal controls and that have come to the attention of management, the internal auditors or the independent auditor.

VII. Communication with Management and Employees

B.    The Committee will meet at least quarterly in separate private sessions with management, the director of the internal auditing department, and the independent auditor to discuss any matters that the Committee believes appropriate. The Committee may request any officer or employee of AIG or its subsidiaries, AIG's outside counsel, or independent
auditor to attend a meeting of the Committee or to meet with any members of, or experts and advisors to, the Committee.

C.    The Committee shall establish procedures for the receipt, retention, and treatment of complaints received regarding accounting, internal accounting controls, or auditing matters and for the confidential and anonymous submission by AIG employees of concerns regarding accounting or auditing matters.

VIII. Other Duties and Responsibilities

D.    The Committee shall discuss the guidelines and policies governing the process by which senior management of AIG and the relevant operations of AIG assess and manage AIG's exposure to risk, as well as AIG's major financial risk exposures, and the steps
management has taken to monitor and control such exposures….

F.    The Committee shall report regularly to the Board. The Committee shall review with the Board any significant issues that arise with respect to the quality or integrity of AIG's
financial statements, AIG's compliance with legal or regulatory requirements, the performance and independence of AIG's independent auditor, and the performance of the
internal audit function.

**Duties Described in AIG's Finance Committee Charter**

57.    Similarly, the Charter of the Finance Committee also specified additional duties and

responsibilities of each member of the Finance Committee, in part, as follows:

AMERICAN INTERNATIONAL GROUP, INC.
FINANCE COMMITTEE CHARTER

I.    Purpose of Committee

The Finance Committee (the "Committee") of the Board of Directors (the "Board") of American International Group, Inc. ("AIG") (i) assists the Board in its oversight responsibilities by reviewing and making recommendations to the Board with respect to AIG's financial and investment policies, (ii) provides strategic guidance to management as to AIG's capital structure, use of capital in its businesses, methods of financing its businesses and other related strategic initiatives, (iii) has the power to approve issuances, investments, dispositions and other transactions and matters in the amounts delegated to the Committee by the Board (other than those reserved to the Board pursuant to AIG's policy for transactions and matters requiring Board approval (the "Board Approval Policy")), and (iv) counsels and advises finance, investment or other similar committees of AIG's subsidiaries, or if no such committee exists at a subsidiary, the Board of Directors of such subsidiary.

*    *    *

IV.    Committee Duties and Responsibilities

To the extent not covered by the Board Approval Policy, the following are the duties and responsibilities of the Committee:

A.    Capital Structure and Financing

•    Approve the issuance by AIG of one or more series of debt securities, shares of nonconvertible, non-exchangeable preferred stock, promissory notes, commercial paper, guarantees, keep well and support agreements or other similar securities or instruments (or any programs relating to the foregoing), the entering into of repurchase and reverse repurchase agreements, borrowing facilities, loan agreements, reimbursement agreements, letter of credit facilities, collateral security or pledge agreements and other arrangements with banks and other lenders and similar or related transactions.

• Approve any issuance of common stock of AIG, including securities convertible into or exchangeable for common stock of AIG up to a level specified by the Board.

• Review and recommend approval by the Board of issuances of common stock of AIG, including securities convertible into or exchangeable for common stock of AIG above any level specified by the Board.

• Review quarterly, or more frequently as the Committee may deem appropriate, reports concerning the capital structure and financing activities of AIG and subsidiaries of AIG.

• Approve capitalization of new subsidiaries of AIG and approve capital contributions and intercompany indebtedness and other support provided to existing subsidiaries of AIG above any level delegated to management.

• Review and recommend approval by the Board of dividend proposals and policies relating to AIG common stock.

• Review and recommend the number of shares or aggregate value of any AIG common stock purchases in the open market or in other transactions in connection with any repurchase program to be authorized by the Board and, subject to any limit established by the Board, authorize the timing, price and manner of any common stock purchases by AIG.

*    *    *

C.    Management of Investments

• Review the asset and liability management policies of AIG and its subsidiaries.

• Review the cash management policies of AIG and its subsidiaries.

• Approve securities lending arrangements and other similar transactions in connection with the lending of securities by AIG where the amount exceeds the amount delegated to management.

• Review quarterly, or more frequently as the Committee may deem appropriate, reports concerning the invested assets of AIG and its subsidiaries, including financial performance, and the asset and liability management of AIG and its subsidiaries.

D.    *Risk Management*

•    Management shall review with the Committee, as the Committee may deem appropriate, reports concerning AIG's exposures to market, liquidity, credit and operational risks in so far as those exposures relate to financial, transactional and other matters considered by the Committee as part of its duties and responsibilities under this Charter.

## Duties Described in AIG's Corporate
## Governance and Nominating Committee Charter

58.    The Charter of the Nominating and Corporate Governance Committee also specified

additional duties and responsibilities of each of the Corporate Governance Committee members, in

part, as follows:

I.    Purpose of Committee

The Nominating and Corporate Governance Committee (the "Committee") of the Board of Directors (the "Board") of American International Group, Inc. ("AIG") (a) identifies individuals qualified to become Board members, consistent with the criteria approved by the Board, and recommends individuals to the Board for nomination, election, or appointment as members of the Board and its committees, (b) advises the Board on corporate governance matters, including developing and recommending to the Board a set of Corporate Governance Guidelines for AIG and (c) oversees the evaluation of the Board of AIG and its committees.

\*    \*    \*

III.    Committee Duties and Responsibilities

The following are the duties and responsibilities of the Committee:

*Corporate Governance.*

A.    To develop and recommend to the Board a set of corporate governance guidelines, to assist the Board in interpreting those guidelines, to review and reassess the adequacy of those guidelines at least annually, and to recommend any changes to those guidelines to the Board.

B.    To oversee, in such manner as it deems appropriate, the evaluation of the Board and committees of the Board.

*   *   *

E.      To advise the Board on corporate governance matters, including recommending practices that enable the Board to comply with applicable laws and regulations.

*Other Duties and Responsibilities*

C.      To take such actions and make such determinations and recommendations as required to comply with the rules of the SEC relating to nominating and governance committee functions and communications between the Board and shareholders.

**Duties Described in AIG's Compensation**
**And Management Resources Committee Charter**

59.     The Charter of the Compensation and Management Resources Committee also specified additional duties and responsibilities of each member of the Compensation Governance Committee, in part, as follows:

IV.     Committee Duties and Responsibilities

The following are the duties and responsibilities of the Committee:

A.      In consultation with senior management, to make recommendations to the Board with regard to AIG's general compensation philosophy, oversee the development and implementation of AIG's compensation programs, and periodically evaluate the competitiveness of its compensation program in relation to its chosen peer group, taking into account AIG's relative size and performance.

B.      To review and approve performance measures and goals relevant to the compensation of the Chief Executive Officer and other senior executives under its purview, evaluate the performance of the Chief Executive Officer in light of those goals and objectives, and determine and approve either as a committee or together with the other independent directors (as directed by the Board) the Chief Executive Officer's compensation, including salary, bonus, and incentive or equity compensation, based on this evaluation.

*   *   *

G.     To oversee AIG's employee compensation programs below the senior executive level.

H.     To review the compliance of AIG officers with AIG's Stock Ownership Guidelines.

\*    \*    \*

J.     To review AIG's programs to identify and develop managerial talent, to review the performance of managers and to encourage and retain managers.

**Duties Described in AIG's Regulatory,
Compliance and Legal Committee Charter**

60.     The Charter of the Regulatory, Compliance and Legal Committee also specified

additional duties and responsibilities of each of the Regulatory Legal Committee members, in part,

as follows:

REGULATORY, COMPLIANCE AND LEGAL COMMITTEE CHARTER

I.     Purpose of Committee

The Regulatory, Compliance and Legal Committee (the "Committee") of the Board of Directors (the "Board") of American International Group, Inc. ("AIG") assists the Board in its oversight of AIG's handling of legal, regulatory and compliance matters. The Committee has the authority to take such steps as it deems necessary and appropriate in providing such oversight, but the Board reserves the right to approve the settlement or disposition of any legal, regulatory or compliance matter that requires Board involvement or action.

\*    \*    \*

IV.     Committee Duties and Responsibilities

The following are the duties and responsibilities of the Committee:

B.     To receive reports, on such intervals as the Committee deems appropriate, from the Chief Internal Auditor regarding internal audit's reviews of AIG's legal, regulatory and compliance functions and to periodically review with the Chief Internal Auditor such reports.

*    *    *

E.    To review periodically management's development of compliance policies and

procedures as are appropriate or necessary.

**Powers, Authority and Resources**
**Granted by Charter to All Committee Members**

61.    Each of the Committees of the Board also granted each of its members broad powers that were designed to enable such committee members to seek outside assistance and/or take any action necessary or proper to fulfill their fiduciary duties and to protect and preserve the interest of the Company and its shareholders.  As evidence of this, each of the Committee Charters contained a nearly identical "catch-all" provision that stated, in substantial part, the following:

VI.     Resources and Authority of the Committee

The Committee shall have direct access to, and complete and open communication with, senior management and may obtain advice and assistance from internal legal, accounting, and other advisors to assist it. In performing its functions, the Committee is entitled to rely on the findings of fact, advice, reports and opinions of management as well as legal, accounting and other advisors retained by AIG. The Committee may retain, if appropriate, independent legal, accounting, and other advisors to assist it, and may determine the compensation of such advisors, and AIG shall be responsible for any costs or expenses so incurred.

## BACKGROUND TO THE RELEVANT PERIOD

62.    By late fall 2007, the destructive power of the subprime mortgage mess had become Wall Street's version of Hurricane Katrina. It has wreaked havoc on the nation's leading brokerage firm, Merrill Lynch, and biggest bank, Citigroup, which had announced billions of dollars in losses and parted ways with their celebrated CEOs.  According to media reports, by that time, banks, brokerages, and lenders had *already* announced almost $50 billion related to the write-down of

structured finance and derivative subprime-related mortgage products, and thousands of layoffs with more scheduled to come.

63.     According to a *Fortune* report, dated November 12, 2007, the destruction of shareholder wealth could only be described as "staggering." In fact, according to this report, since June 29, 2007, Citibank's share price had declined by 35%, from $51 to $33, while Merrill's stock has slid from $84 to $54, a 36% decline. In the same period, the dozen biggest Wall Street firms and the commercial banks with the largest investment arms -- a list that includes Bank of America, J.P. Morgan Chase and Credit Suisse -- had lost more than $240 billion in market value. Dozens of smaller mortgage-related businesses had suffered huge losses or failed completely.

64.     In fact, according to the *Fortune* report and other available media sources, by the end of November 2007, the nation's largest investment and commercial banks had *already* taken tens of billions of dollars in write-downs related to their structured finance products. This list included, in part, the following:

### WRITE-DOWNS ON STRUCTURED PRODUCTS AS OF 11/07[1]

| | | |
|---|---|---|
| **Citigroup** | **$9.8 billion** | This is the low estimate; Citigroup says the figure could be $3 billion higher. |
| **Merrill Lynch** | **$7.9 billion** | Analysts project that the broker will have to write down billions more this quarter. |
| **UBS** | **$4.4 billion** | UBS still has nearly $40 billion in CDOs and mortgage-backed |

---

[1]  Structured products include collateralized debt obligations, collateralized loan obligations, asset-backed securities, and mortgage-backed securities. They do no include leveraged loans.

### WRITE-DOWNS ON STRUCTURED PRODUCTS AS OF 11/07[1]

| | | |
|---|---|---|
| | | securities on its books.  By 12/10/07, this figure was raised to $10.0 billion; sells $11.48 billion in new capital to Middle East investor. |
| **Morgan Stanley** | **$3.7 billion** | Morgan's total subprime exposure after write-downs stands at $6 billion.  Loss comes with $2.5 billion hit to earnings. |
| **Wachovia** | **$2.1 billion** | Wachovia was among the top issuers of subprime mortgage CDO debt this year.  By 11/10/07, figure raised to over $3.0 billion. |
| **Washington Mutual** | **$975 million** | Anticipated write down of $975 million in 4Q:07.  Company has 1/10 the market capitalization  of Bank of America. |
| **Credit Suisse** | **$948 million** | Credit Suisse lost nearly another $1 billion on leveraged loans. |
| **Lehman Brothers** | **$700 million** | Total includes leveraged loans; Lehman does not provide more detail.  1,200 employees laid off on Aug. 29. 2007. |
| **Bank of America** | **$3.527 billion** | CEO Ken Lewis is cutting back the company's investment-banking operations. |
| **J.P.    Morgan Chase** | **$339 million** | CEO Jamie Dimon is credited with losing less than his peers. |

65.    In addition to the foregoing, by mid-December 2007, Bear Stearns as well had announced a $1.9 billion write-down that wiped out all of that company's revenues for the three months ended Nov. 30.   By mid-January 2008, Citigroup announced that it had taken an $18 billion charge related to subprime-related costs, in addition to slashing its dividend by 41%.  Days after Citigroup announced its massive charges, Merrill Lynch also announced an additional $14.1 billion in subprime-related losses, bringing its total to approximately $23 billion and causing a loss of $9.83 billion for the fourth quarter of 2007.

66.    The significance of these massive write-downs by AIG's competitors in November and December 2007 could not have been ignored by the Company, its Board and management, or its investors.  In fact, by the end of 2006, AIG had reported that it earned a record-setting $14 billion in profit and the Company appeared poised to exceed that record through the first half of 2007.  Fueling this reported success was the remarkable growth in the Company's Capital Markets division, which went from a billion dollar loss to a billion dollar <u>gain</u> in one year.   Driving demand for AIG's products and leading to profitability was AIG's newfound dependence upon structured finance derivative instruments called credit default swaps.[2]

67.    In fact, however, unlike the Company's many competitors who were also involved in the subprime mortgage credit derivatives and financial services markets, and who had *already* taken massive charges by the end of 2007, Defendants consistently told analysts and investors that AIG had <u>exited</u> the subprime mortgage market as early as the end of 2005, and that it did not have large

---

[2] AIG engages in the residential mortgage market in at least four ways.  First, AIG acts as a mortgage originator through its subsidiary American General Finance.  Second, AIG's insurance and financial subsidiaries invest in collateralized debt obligations (CDOs) and other mortgage-backed securities which utilize residential mortgage loans as collateral.  CDOs are instruments that bundle various mortgage-backed securities into various "tranches" that correspond to the level of credit risk associated with the underlying mortgages; they are structured so that the most senior tranches are entitled to first dibs on the income streams, with other tranches receiving the additional income, if any, remaining after more senior tranches are paid.  Third, AIG acts as a securitizer of subprime mortgages, which it packages into various securities, including CDOs, that it markets to investors.  Fourth, AIG, through its subsidiaries, acts as an insurer for investors looking to hedge risk on CDOs and other securities tied to the residential mortgage market.  It is this fourth branch of AIG's mortgage-market activities that is at issue in this case.  A division of AIG, AIG Financial Products, issues credit protection through "credit default swaps" on select CDOs.  These credit default swaps (CDSs) are used by investors to hedge risk exposure to the underlying CDOs and similar securities.  CDSs are in essence derivative instruments in which one party agrees, for a periodic fee, to assume the risk of non-payment of an underlying asset.  In the event of default, the CDS seller is obligated to compensate the CDS purchaser for the defaulted amount.

exposure to losses related to subprime mortgages. As an example of the types of statements that Defendants had made prior to the inception of the relevant period, during the regularly scheduled conference call announcing results for the third quarter 2007, held on November 8, 2007, Defendants made the following comments and remarks:

* "[W]e believe the effectiveness of our enterprise risk management systems and procedures was demonstrated and the benefits of our diversified portfolio of global businesses once again proved valuable. We also emerged from the quarter with a strong balance sheet. We've reported shareholder's equity of $104 billion, tangible shareholder's equity of over $95 billion and social assets of over $1 trillion."

* "AIG has ample financial resources to weather continued uncertainty as well as to take advantage of attractive market opportunities as they emerge."

* The Company then had the "right strategy in place" to deliver value through "sustainable revenue growth, cost containment and effective management of risks."

* AIG views much of the recent pricing developments as "more a result of market turmoil than indicating fundamental and permanent deterioration in the credit characteristics" of the Company's holdings.

68. At that time, Defendants also again conditioned investors to believe that they remained comfortable with AIG's portfolio risk management processes and procedures, in part, as follows:

* AIG remains comfortable with the size and the quality of its investment portfolios and its operations.

* AIG has strong enterprise risk management processes in all the areas where the Company was active and, the risks taken were analyzed based upon independent analyses and the Company's, modeling and monitoring.

* Even if the market continued to experience a period of adjustment and volatility, the risk profile of AIG portfolios was appropriate for the size of the Company, its leading market position and its skill and expertise as a leader in insurance and financial services.

* AIG Management and the Board employed conservative lending assumptions and maintained high underwriting standards such that AIG Financial Product's credit

quality remained strong and delinquency and loss experience – although somewhat higher than the historic lows evidenced in 2006 – still remained under target estimates.

69.    At that time, Defendants caused AIG to again maintain that any risk of loss was remote and immaterial, and that Defendants had already caused AIG to take enough reserves to cover any foreseeable risk of loss related to its investment portfolios and again stated, in part, that:

*    While the activities of AIG Financial Products division involve "significant notional exposure," the ultimate credit risk actually undertaken is "remote" and has been "structured and managed effectively."

*    Because AIG-FP stopped writing new Super Senior Credit Default Swap protection that included subprime collateral in December 2005, its total exposure – after deducting all subordination – across all deals to vintages of 2006 and 2007, totals just $323 million.

*    The officers and directors of the Company continue to manage risk carefully and, as a result, AIG was then well positioned to respond to both challenges and opportunities all with the focus of further increasing shareholder value.

*    Management and the Board have adopted a "very rigorous quarterly reserve analysis process" and a very "conservative view" of loss estimates.

70.    At that time, Defendants again caused the Company to credit AIG's limited credit exposure to Defendants' own adherence to strict underwriting criteria, in part, as follows:

And as we've said many times, we were fortunate in that Andy and his team came to me at the end of '05 and they said, look, we're not happy with the underwriting standards that we're seeing in the U.S., we're uncomfortable about what's going on in the new vintages that are being developed, we think we should exit this businesses. And we did that. We went and talked to many of the folks that we were working with and let them know that we were going to be exiting writing this business because there were teams of people who were working very closely with us on this.

What that did is it resulted then in that we have a limited exposure to the very, very problematic vintages….

71.     The Company's Senior Vice President and Chief Risk Officer, Robert Lewis, summed up the purported financial and economic condition of the Company just prior to the inception of the relevant period, in part, as follows:

> AIG is weathering the ongoing market downturn through its strong cash flow and its superior financial position. AIG's enterprise risk management function is thoroughly engaged in this environment at all levels of the organization, assisting our businesses in identifying emerging risk factors and assessing, analyzing, monitoring and managing them. We are involved in all phases of the process from independent analysis and portfolio review to quality assessments to reserve determinations to risk management tactics and strategies. We are well positioned to address the challenges this environment is presenting.

72.     Unbeknownst to investors, however, and as the public would eventually discover, AIG, through AIG Financial Products, was the counterparty on credit default swaps covering at least *$527 billion* in potential defaults, including over $78 billion linked to potential defaults of collateralized debt obligations as of December 31, 2007.   As investors would only learn in July 2008, however, these derivative instruments had *already* suffered impairments that would result in tens of billions of dollars in write-offs, and would create a liquidity crisis that would cause AIG to dilute investors by selling over $20 billion of additional new equity.

## DEFENDANTS' ILLEGAL AND IMPROPER COURSE OF CONDUCT

### The December 5, 2007 Investor Presentation

73.     It was against the above background that, by the end of 2007, the Company faced "the second period of significant turmoil to roil the Company in roughly three years, threatening its efforts to return to stability," as later described by the *Wall Street Journal*.  [*WSJ*, 6/9/08]  Thus, on December 5, 2007, Defendants scrapped plans for a presentation on its Life Insurance operations abroad and instead held a widely publicized and well attended investor presentation that purported to provide investors with significant details relating to the Company's financial condition, risk

exposure, reserves, and the assumptions, processes, and procedures used by Defendants to support their conclusions.

74.     The presentation on December 5, 2007 – referred to herein as the "December 5, 2007 Investor Presentation" or the "Presentation" – lasted nearly *five hours* and produced almost 100 pages of transcript.  Consistently throughout the Presentation, defendant Sullivan and other senior managers of the Company – on behalf of the Company at the direction, and with the knowledge and consent, of all Defendants – baldly stated that AIG was "confident" in how it valued its investments in swaps.  These senior managers referred to AIG's exposure to risk of loss on such investments as "*manageable*."

75.     As detailed herein, however, the December 5, 2007 Investor Presentation was rife with misrepresentations and omissions concerning the true state of affairs at AIG.

### Sullivan's Opening Remarks

76.     As defendant Sullivan began the Presentation, he emphasized that the purpose of the meeting was to provide investors a "better understanding" of AIG's risk exposure in its non-insurance business.  Sullivan stated that the purpose of the call was to give investors a "clear sense" as to what senior management and the Board knew, and why they "remained comfortable" with AIG's then current fiscal position.  In summary, Sullivan's opening remarks focused on the following:

> *         That AIG was distinguished from its competitors, which had much larger sub-prime related exposure, because ***Defendants utilized highly effective risk controls and monitoring procedures which were sufficient and effective and which foreseeably would continue to insulate AIG from massive losses or liquidity***.
>
> *         That Defendants had ***limited AIG's exposure to mortgage related losses by effectively abandoning this market in late-2005*** after which Defendants caused the

Company to modify the form of its exposure by "moving to higher quality and shorter duration" instruments.

* That management and the Board continued to endorse a five-year goal to grow adjusted earnings per share from 10% to 12% per year, primarily through organic growth, and that it was reasonable to expect adjusted returns on equity of approximately 15% to 16% over the same five-year time period.

* That it was reasonably foreseeable that AIG would continue to operate according to plan – just as it had over the past 30 months – and that at that time, the Company was able to "generate strong profitability, in many cases when others did not."

77.    Sullivan distinguished what he described as the very large "notional" amounts of exposure related to AIG Financial Products Super Senior credit derivative portfolio, and the supposedly more real, "economic" loss related to this portfolio.  Sullivan stated that, because AIG's business was "carefully underwritten and structured,*" **the probability that the Company would sustain economic losses was "close to zero."*** Again, Sullivan attributed this limited loss to, the following:

- AIGFP stopped writing new business on collateralized debt obligations ("CDOs") with subprime RMBS collateral at the end of the 2005, and while the business would likely continue to show some volatility, it would be **unlikely to sustain an economic loss.**

-  Management and the Board maintained a rigorous due diligence process, "very focused on structure and stress," and on "how stress-testing key variables affect those structures." **All underlying collateral had been properly evaluated** and AIG maintained the financial wherewithal to hold to recovery.

- **The effectiveness of, and Defendants' adherence to, AIG's risk management practices allowed the Company to select better quality assets and make better RMBS investments – ones that were more insulated from risk of loss and ones that were not then experiencing significant loss or reduction in value.**

78.    In concluding his opening remarks, Sullivan reassured investors as follows:

Now at the end of the day, what is the bottom line? And, what should you take away from today's discussions? First of all that **AIG has accurately identified all areas of exposure to the U.S. residential housing market**, second, we are confident in our marks and the reasonableness of our valuation methods. We cannot predict the

future, but we have in what we -- what **we have, a high degree of certainty in what we have booked to date.** Thirdly, **AIG's exposure levels are manageable,** given our size, financial strength and global diversification. Fourth, AIG is fortunate to have a diverse portfolio of leading businesses with tremendous earnings power.

AIG's goal over the next five years is to grow adjusted earnings per share in the 10% to 12% range and to generate adjusted return on equity of approximately 15% to 16% over this period of time. And lastly, AIG is well positioned to capitalize on current and future opportunities, and management has not been and will not be distracted from its focus on building shareholder value.

79.    Sullivan was followed by defendant Joseph Cassano, President and CEO of AIG Financial Products.  Cassano assured investors that one of the goals of the Company's management and Board in hosting the presentation that day was to, "set out for you the economic reality of our portfolios so you can cut through some of the popular press, some of the hysteria, some of the misinformation, I think, that is floating around in the market."  Most notably, in his opening remarks, defendant Cassano stated, in part, that:

The market talks about it in different ways. Everybody has a different process for evaluating it. We define Super Senior risk as the risk associated with that portion of our highly negotiated, highly structured credit derivative portfolio where under worst-case stresses and worst-case stress assumption including portfolio managers' abilities to replenish assets and the performance of those underlying assets that there will not be any loss on a transaction. **And so, we hold ourselves to a pretty high standard, but we think we've been able to construct a business that meets those standards.**

80.    In addition to defendant Cassano, the head of the Company's Asset Trading and Credit Products division, defendant Andrew Foster, told participants that:

**there's an awful lot of protection built into these transactions prior to any chance of our transactions being hit.**

                              *    *    *

we are combining fundamental and rigorous credit selection. **And then, we add in the conservative modeling to go with it.**

*    *    *

On each transaction we do, we then review all of the underlying assets whatever they are, and *we set tight and very specific guidelines over any changes or management that's being proposed.* All of this is with the basic aim of trying to ensure that we have very diversified portfolios across asset classes and that we exclude, as much as possible, all of the weaker sectors or assets that we can identify.

*    *    *

*…a fundamental and rigorous credit analysis to start with.*

Now, of course in everything that we do, we do want to make sure whilst we have a generic approach making sure that we combine the analysis with the modeling, we do carry out very specific due diligence in modeling,

81.    During this presentation, management and the Board also approved of the participation of University of Pennsylvania Wharton School of Business, Professor, Gary Gorton, who opined on the adequacy and sufficiency of the Company's modeling and risk analysis procedures.  Notable among Gorton's remarks was his statement that the models that Defendants' caused to be employed at AIG were calibrated based on a loss distribution that was "worse than the worst post-war recession" in the location analyzed.  In explaining the purported conservative nature of the assumptions adopted by Defendants and used in AIG models, Professor Gorton stated, in part, that:

So, our models that are based on ratings only take their relative ranking and then what we do is, we calibrate the models again so that we're just worse than the worst U.S., or whatever country we're in, post World War II recession as the mean. And then, our tranching is going to be based on looking at the tail of that distribution.

Defendant Forster similarly stated:

*We also always assume the worst is going to happen to us.* So even after we've positively selected our managers, positively selected our structure, positively selected the assets that are going into it, *we still assume that everyone's out to get us.* So, we – when we're modeling things, *we assume that they will create the worst possible portfolio that they can that the legal documents allow them to.* So even though we

don't expect them to do that, even though the managers don't expect them to do that. The way we run our business is to assume that they will do that, and they will do that as soon as it's humanly possible.

We also apply through all of this, is the significant haircuts, both to the ratings that we're using through our modeling and also through the recovery rates that we use, which are significantly below those used by the rating agencies.

82.    On behalf of management and the Board, defendant Foster also stated that, as a result of Defendants' superior underwriting and risk management, AIG's collateral had performed "much better" than that of its competitors.   Defendant Foster also stated that any reduction in value associated with the 2005 vintage products or any foreseeable loss at that time was "well within the tolerances" in terms of the models AIG utilized.

### False Statements Regarding AIG's Market Exposure

83.    During the December 5, 2007 Investor Presentation, Cassano also provided guidance on the Company's foreseeable exposure to non-insurance market loss, in part, as follows:

I think we will have, or my estimate is we will have a further write-down from the October number of somewhere between $500 million and $600 million. I love it, everybody wrote that number down, after everything I've been saying today.

And just for clarity's sake, we gave you a posting in October of $550 million, again we're telling you somewhere between $500 million and $600 million and we're saying that's an estimate right now.

84.    On a "mark-to-model," quarter-to-date basis, according to defendant Cassano, that would put the total at approximately $1.1 billion in losses.    According to defendant Cassano, however, at that time, the impact of these "mark-to-model" losses was *significantly less* than the actual foreseeable losses related thereto.  This opinion was evidenced by the exchange that occurred during the Presentation between defendant Cassano and Goldman Sachs analyst in attendance, Tom Cholnoky, as follows:

CHOLNOKY: Mark-to-model, just to make sure, you don't actually expect these to actually generate economic loss for you. This is an indication that, if you were to sell your portfolio today or sell these securities, you would have to recognize that loss. But to the extent that you have the ability to ride out the duration of the contract, these would ultimately reverse these charges, just to understand that. Is that correct?

CASSANO: That's absolutely correct. Now let me just, what Tom is saying is absolutely correct. We see the $1.1 billion, and we should add to it the $350 million from the third quarter of last year right, the end of the September numbers, so the approximately $1.5 billion as a mark that someone might make us pay to take on these liabilities in this aberrant market conditions. ***But we don't have to sell, they're all synthetic, there's nothing that compels us to sell these trades.*** Our fundamental analysis says this is a money good asset. We would not be doing the shareholders any benefit by exiting this right now and taking that loss. ***And over the average lives that you see us post for the maturity of these transactions, these losses will come back and these are money good instruments that we have.***

### Other Red flags Ignored by the Board

85.    In addition to the huge write-downs that had already been taken by the Company's other competitors related to their investments in subprime related instruments, during the December 5, 2007 Investor Presentation more red flags were raised that no responsible Board member or senior manager could have, or should have, missed.  These red flags, separately or together, should have caused a reasonable AIG director to question the accuracy and propriety of the Company's accounting for credit default swaps and, thus, its overall financial condition.  These red flags unquestionably establish both the falsity of the misstatements set forth herein and each Defendant's conscious awareness of it as false.

86.    For example, an unidentified audience member asked for clarity as to why the Company's 3Q:07 Form 10-Q, which had recently been filed with the SEC, contained a statement that management and the Board's assessment of certain Super Senior credit default swaps and the related collateral "differs significantly" from the assessment made by counterparties to the swaps. The section of the 3Q:07 Form 10-Q that this analyst was referring to stated, in part, the following:

The valuation of the super senior credit derivatives has become increasingly challenging given the limitation on the availability of market observable information due to the lack of trading and price transparency in the structured finance market. These market conditions have increased the reliance on management estimates and judgments in arriving at an estimate of fair value for financial reporting purposes. Further, disparities in the valuation methodologies employed by market participants and the varying judgments reached by such participants when assessing volatile markets has increased the likelihood that the various parties to these instruments may arrive at significantly different estimates as to their fair values.

As of October 31, 2007, AIG is aware that estimates made by certain AIGFP counterparties with respect to the fair value of certain AIGFP super senior credit default swaps and the collateral required in connection with such instruments differ significantly from AIGFP's estimates.

For a further description of AIGFP's risk management practices in its credit default swaps business, see Management's Discussion and Analysis of Financial Condition and Results of Operations — Risk Management — Segment Risk Management — Financial Services in the 2006 Annual Report on Form 10-K.

87.    In response to the audience member, Cassano did everything he could to minimize the significance of the difference of opinion with AIG's counterparties.  Specifically, he stated that the disagreement with its counterparties over valuations were ***not material***, and meant only that ***"the market's a little screwed up."***

88.    Thus, in addition using the Presentation to condition investors to disregard the material adverse market information that reasonably called into question Defendants' market valuation analysis, Defendants also used this presentation to condition investors to believe that the strict underwriting criteria that Defendants had instituted at AIG had allowed the Company to avoid much of the losses suffered by competitors.  Defendant Foster, for example, explained the benefits of this purported strict underwriting, in part, as follows:

[C]learly we do have subprime exposure in the transactions we've outlined there, but we did stop committing to new transactions at the end of December of '05 that included this subprime collateral. And this was through the ongoing due diligence that we've talked about. It was through our stressing of the underlying assets that we

were seeing but also through the many meetings that we held with everyone related to the market, from the managers, the originators, the servicers, the repackagers, we met all of them. And we came back from our trips thinking things are changing and they are clearly not changing for the better.

So as a result, we stopped accepting the collateral and pulled out of the business. This has meant, as Martin outlined, that we have very little exposure to the troubled vintage of '06 and '07….

89.    Another red flag was raised when an unidentified audience member asked what the impact would be of a loss projection that was based, not on AIG's own techniques, but on a major market index such as the ABX (the index for mortgage securities linked to the subprime housing market) or, for that matter, values assigned by the counterparties to the transactions with which AIG had disagreed. Defendant Cassano responded abruptly that to adopt such techniques would be "nonsensical."  The audience member persisted:

AUDIENCE MEMBER: But what would the nonsensical number -- ?

CASSANO: I don't know. It's nonsensical.

AUDIENCE MEMBER: Could it be north of [i.e., greater than] $5 billion?

CASSANO: *You know I have no – do you have any idea? I don't know. We don't know.* Look we're in the business of going to the core fundamentals. The ABX is just not representative of the pool of business that we have. And it's not that we don't look at it because we don't like the numbers, today I like it, it's up eight points I think, what is it, it's up eight points in two days. It's just that it's not -- *I'm trying to think how to convey this in a way that people will stop asking me.*

90.    Cassano's responses at the Presentation continued to raise obvious red flags about AIG's financial health.  Thus, later in the Presentation, Cassano again downplayed the significance of the counterparty valuations, and highlighted the differences among those bids as evidence of their insignificance:

AUDIENCE MEMBER: And just shifting over to those counter-party bids that you that you received, the counter-party bids, Joe, the differences were pretty dramatic. Is that fair to say?

CASSANO: What was interesting --.

AUDIENCE MEMBER: (inaudible) counter-parties.

CASSANO: It was the collateral calls.

AUDIENCE MEMBER: Yes.

CASSANO: What was interesting was the difference among each other. That was more interesting to me than the differences between us and them. *And it tells you that the Street is just having an enormous problem putting value on here.* And when you see that then we need to go to ground and figure out how we manage through and figure out what the numbers are. And we're AIG, we deal with the top-tier firms and the valuations are quite different and dramatically different among each other. So you need to go into ground and figure out what are causing the differences and where are they coming from.

### **Additional Evidence of Board Awareness**

91.     Sullivan provided further evidence of the Board's awareness and acquiescence in AIG's accounting policies, specifically noting the high level of Board participation in the decision-making and leadership of AIG at that time.  During his opening remarks, after noting the attendance of defendant Offit, a Board member, Sullivan explicitly stated, "You can also take comfort that your Board of Directors is actively engaged in our deliberations about capital and its deployment…."  Moreover, Sullivan described the "centralized" nature of AIG's risk management systems, in part, as follows:

> *Now as you have heard before, we are very proud of our risk management culture and practices.* The many years AIG has been a -- has had a centralized risk management function that oversees the market, credit and operational risk management units in each of our businesses as well as at the parent company. *We have our arms around what is happening through AIG and believe we have demonstrated this through timely and comprehensive disclosure and accuracy in*

*our reporting.* Most importantly, the effectiveness of AIG's risk management efforts will come through in our results.

92.    Other managers of AIG went on to emphasize the centralized nature of the Company's information reporting systems, which *further facilitated the Board's supervision of the day-to-day operations of the Company*.  Defendants boasted that a "massive amount of analysis" goes on every month, including regular meetings of the Credit Policy Committee, chaired by Rick Geissinger, CEO of American General Finance, and composed of the majority of the Company's senior officers, and regular review of more than 100 pages of data and graphs at each meeting.  In addition, trends affecting the Company's portfolios were also discussed among management committees, and the Credit Policy Committee was also reported to have regular meetings with the Enterprise Risk Management division members.

93.    Defendant Robert Lewis, Chief Risk Officer, also spoke during the Presentation.  He reported that the Credit Risk Committee regularly conducted a "very active enterprise risk management process" at the corporate level and across the Company.  Again, defendant Lewis explained the centralized nature of AIG's risk management procedures, processes and controls, in part, as follows:

> AIG is a decentralized organization, and our business executives make decisions on businesses to achieve risk-adjusted returns over their -- in their business models, over their cycles and in their businesses. What we do at the holding level is to ensure that that's done with integrity, done with quality and that the aggregation of those risks do not rise to anything that would be a concentration of risk at the AIG level.
>
> [W]e do have quite an active holding company, enterprise risk management, which is holistic and does share information across the corporation.

94.    During this call, it was also explained that every single Super Senior swap transaction had to be approved by management's Credit Risk Committee and that the larger of these transactions were also approved directly by defendant Sullivan.

## VIOLATION OF FEDERAL SECURITIES LAWS

95.    Each of the statements by Defendants in December 2007 set forth above was false and misleading under the federal securities laws.  At the time each statement was made, there was no reasonable basis to believe it, it was not made in good faith, each Defendant knew that the assumptions underlying it were faulty, and each Defendant knew of facts which would seriously undermine the statement.  Among other things:

(a)    Defendant Cassano had no answer to the question why AIG's valuations of swaps differed from those of its counterparties, admitting that "the market's . . . screwed up."

(b)    Defendant Cassano conceded that, despite his reassurances that the potential realized losses would not be as large as the "notional," unrealized losses might indicate, no one believed him:  "I love it, everybody wrote that number down, after everything I've been saying today."

(c)    Defendant Cassano conceded that "the Street is just having an enormous problem putting value on here."

(d)    Defendant Cassano conceded that he could not come forth with a legitimate reason why AIG's valuations of swaps should be trusted over contrary valuations indicated by counterparties and major market indices:  "*I'm trying to think how to convey this in a way that people will stop asking me.*"

(e)     Defendant Cassano conceded that he simply didn't know whether actual losses on swaps would be $500 million or $5 billion:  *"You know I have no – do you have any idea? I don't know. We don't know."*

96.     Defendants' statements during the December 5, 2007 Investor Presentation were also materially false and misleading and violated federal securities laws in that, known to Defendants but undisclosed to investors, Defendants had secretly employed a special valuation methodology to the Credit Default Swaps for purposes of the Presentation, that involved giving maximum effect to certain accounting techniques known as CDFs and NBAs, which had never before been used by AIG, and was never used again.

97.     In fact, in the Company's Form 10-Q filed with the SEC in early November 2007, Defendants admitted that they could not reliably employ CDFs or NBAs to calculate the correct values of the CDS portfolio.  Then, a few months later, when the Company filed its Form 8-K on February 11, 2008, Defendants disclosed that, despite their unreliability, these techniques had, in fact, been used to value the portfolio for purposes of the December 5, 2007 Investor Presentation. Moreover, on February 11, 2008, Defendants again informed investors that the CDF and NBA techniques were not reliable.

98.     Only one inference is possible from Defendants' manipulation of the valuation techniques:  that Defendants' stated values for the CDS portfolio at the December 5, 2007 Investor Presentation had no reasonable basis in fact and were knowingly false when made.

99.     The materiality of the positive reassurances and favorable guidance provided, sponsored and/or endorsed by Defendants at the December 5, 2007 Investor Presentation cannot be overstated.  As evidence of this, immediately following the Presentation, shares of AIG rallied on

very heavy trading volume.  Accordingly, from December 4, 2007, prior to the Presentation on December 5, 2007, shares of the Company closed at $55.65 per share, the following day, December 5, 2007, as the conference was conducted, shares of AIG rallied up to over $59.39 per share before closing the trading day at $58.15 per share.

100.    The following day, December 6, 2007, as the market digested the statements published by Defendants, shares of AIG continued to trade higher, reaching $61.68 and then $62.30 the next day.  This share price appreciation represented an increase in the Company's market capitalization of approximately $16.8 billion over the course of three trading days.

**DEFENDANTS' BELATED DISCLOSURES AND<br>ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS**

101.    Defendants' gross negligence in failing to protect AIG from the crisis of their own making could not remain concealed forever.  Thus, beginning in February 2008 -- only weeks after the December 5, 2007 Presentation -- Defendants began to issue a string of press releases that purported to disclose the worsening financial condition of the Company, but also continued to conceal the true extent of the impairment of AIG's derivatives portfolio and other assets.  In addition, from the time of the December 5, 2007 Investor Presentation onwards, Defendants also took actions to enrich and entrench themselves at AIG, and bestow an almost unparalleled largesse upon themselves at the expense of the Company.

**$4.88 Billion Charge in 4Q:07**

102.    On February 11, 2008, less than six weeks after the December 5, 2007 Investor Presentation, shares of AIG fell over 12% in a single trading day after Defendants caused the Company to file a report with the SEC, pursuant to Form 8-K, announcing both, that AIG had a material weakness in its accounting system, procedures and financial controls, and that the Company

would be caused to lower the value of its credit default swap derivative contracts by an estimated

$4.88 billion – well below levels stated in the December 5, 2007 presentation.  The Form 8-K stated,

in part, the following:

**Item 8.01.**                                                   **Other Events.**

In connection with the preparation of its 2007 financial reports, American International Group, Inc. ("AIG") has recently concluded that AIG should clarify and expand its prior disclosures relating to the methodology and data inputs used to determine the fair values of the super senior credit default swap portfolio in respect of multi-sector collateralized debt obligations ("CDOs") of AIG Financial Products Corp. and AIG Trading Group Inc., including their respective subsidiaries (collectively, "AIGFP").

The initial implementation of the BET model did not adequately quantify, and thus did not give effect to, the benefit of certain structural mitigants, such as triggers that accelerate amortization of the more senior CDO tranches.

As disclosed in the Form 10-Q, AIG did not give effect to these structural mitigants ("cash flow diversion features") in determining the fair value of AIGFP's super senior credit default swap portfolio for the three months ended September 30, 2007. Similarly, these features were not taken into account in the estimate of the decline in fair value of the super senior credit default swap portfolio through October 31, 2007 that was also included in the Form 10-Q because AIG was not able to reliably estimate the value of these features at that time. Subsequent to the filing of the Form 10-Q, through development and use of a second implementation of the BET model using Monte Carlo simulation, AIGFP was able to reliably estimate the value of these features. Therefore, AIG gave effect to the benefit of these features in determining the cumulative decline in the fair value of AIGFP's super senior credit default swap portfolio for the period from September 30, 2007 to November 30, 2007 that was disclosed in AIG's Current Report on Form 8-K/A, dated December 5, 2007 (the "Form 8-K/A") filed after AIG's December 5, 2007 Investor Presentation.

103.    The February 11, 2008 Form 8-K reported the purported impact of the devaluation of

the Company's Super Senior credit default swaps was, as follows:

| (in millions) As of | Gross Cumulative Decline in Valuation During 2007 | | Benefit of Structural Mitigants (Cash Flow Diversion Features) | | Cumulative Decline in Valuation Net of Cash Flow Diversion Features | | Benefit of Spread Differential (Negative Basis Adjustment) | Cumulative Decline In Valuation As Previously Disclosed | |
|---|---|---|---|---|---|---|---|---|---|
| September 30 | $ | 352 | $ | 0 | $ | 352 | Not Applicable | $ | 352 |
| October 31 | $ | 899 | $ | 0 | $ | 899 | Not Applicable | $ | 899 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| November 30 | $ | 5,964 | $ | 732 | $ | 5,232 | $ | 3,628 | $ | 1,604 |

[Notes omitted]

## Material Weakness and  Remediation

104.     The February 11, 2008 Form 8-K stated that at year end 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value of its Super Senior Credit Default Swaps, as follows:

> AIG has been advised by its independent auditors, PricewaterhouseCoopers LLC, that they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio. AIG's assessment of its internal controls relating to the fair value valuation of the AIGFP super senior credit default swap portfolio is ongoing, but AIG believes that it currently has in place the necessary compensating controls and procedures to appropriately determine the fair value of AIGFP's super senior credit default swap portfolio for purposes of AIG's year-end financial statements.

105.     Remarkably, PWC was the same auditor that had given an unqualified endorsement of AIG's financials for the years 2000-2003 and the first three quarters of 2004, only later (after AIG had fired its former CEO, Hank Greenberg[3]) PWC endorsed the view that the financials for all those years had to be restated.  AIG ultimately paid $1.6 billion to settle a New York State Attorney General civil action.  However, later, in an amended SEC filing in March 2006, the Company reversed much of the charge related to the adjustments that had been taken related to life-insurance settlements.

106.     At the time this material weakness was announced in mid-February 2008, as previously, the Board took no action against PWC, nor has the Board initiated any investigation into

---

[3]  Two months after the Board fired Greenberg on March 14, 2005, AIG restated five years of financial statements.

why the Company's independent auditors allowed AIG to continue to operate with materially weak

accounting controls and procedures and without adjusting the value of its credit default swaps or the

value of its other assets, investments and collateral. Alternatively, what is known about PWC is that

in 2007 and 2006 AIG paid combined audit and non-audit fees of $119.5 million and $106.7 million,

respectively.

107.    Despite the disclosure of this material weakness, the February 11, 2008 Form 8-K

was misleading in that Defendants used this filing to cause the Company to report that management

and the Board had *already* substantially cured the deficiencies cited. As evidence of this, at that

time, Defendants falsely assured investors that "AIG believes that it currently has in place the

necessary compensating controls and procedures to appropriately determine the fair value of

AIGFP's super senior credit default swap portfolio . . . ."

108.    Thus, from the time Defendants revealed this Material Weakness, they also guided

investors to believe that AIG had implemented remediation efforts necessary to address the material

weakness in controls and procedures in place and related to its accounting for its credit default swaps

and derivative portfolios, and that these were sufficient to ensure that the Company's financial

statements were accurate in all material respects.

109.    In an effort to minimize the impact of the February 11, 2008 disclosures, the

following day (as shares of the Company declined by their largest single day decline since the

market crash of 1987 and as AIG lost over $15 billion of market capitalization value), Defendants

caused the Company to issue a release stating that management and the Board continued to believe

that the true impact of the Super Senior Credit Default Swap losses would not be material. This

release, published on February 12, 2008, stated in part, the following:

AIG continues to believe that the mark-to-market unrealized losses on the super senior credit default swap portfolio of AIG Financial Products Corp. (AIGFP) are not indicative of the losses AIGFP may realize over time. Based upon its most current analyses, AIG believes that any losses AIGFP may realize over time as a result of meeting its obligations under these derivatives will not be material to AIG.

## $5.3 Billion Loss and $11.1 Billion Derivatives Charge Reported in FY:07

110.    On February 29, 2008, when Defendants caused AIG to report results for the fourth quarter and full year 2007, the period ended December 31, 2007, the Company was caused to report a loss even larger than previously announced only two weeks before, on February 11, 2008.  On February 29, 2008, as AIG filed its 2007 Form 10-K with the SEC, Defendants caused the Company to report the largest quarterly loss in the Company's history -- dating back to 1919 -- of $5.3 billion. This massive loss included the enormous write-down of $11.12 billion on derivatives backed by residential mortgages.  For the entire year, AIG reported net income that was nearly 56% lower than the amount purported to be earned in 2006.

111.    The write-down of AIG's derivatives portfolio was not the only mortgage-related blow to the Company and, at that time, Defendants also caused AIG to record a $2.63 billion capital loss related to charges in its general investment portfolio, as well as $643 million in charges related to investments held by the Financial Products unit.  Based on Defendants' February 11, 2008 disclosure that AIG would be caused to write down the value of its derivative portfolio and credit default swaps by $4.88 billion for October and November alone, this would indicate that in December 2007, the value of that portfolio declined by an additional $6.24 billion.

112.    It is obvious that the Board caused or allowed the Company to wait until mid-February 2008 to begin to reveal the true financial and operational condition of AIG – as opposed to revealing the impaired condition of the credit default swaps and investments during the December 5,

2007 Investor Presentation, because this allowed management and the Board to finish the 2007

performance reviews that were purportedly scheduled to occur in January 2008 – before the time that

AIG was caused to reveal the impaired condition of the Company.  Postponing the disclosure of even

the first of the subprime-related derivatives charges until after the 2007 performance reviews caused

and allowed the Compensation Committee and the Board to pay millions of dollars in unearned

performance bonuses to senior officers of AIG, certain of whom were also then Board members of

the Company.[4]

**Additional Waste of Assets: Defendants Increase AIG's Dividend**

113.    On May 8, 2008, Defendants caused the Company to announce that AIG would

increase the Company's dividend by at least 10% over the prior year.  This decision would cost AIG

at least an additional $200 million per year in addition to the estimated $2 billion the dividend

already cost the Company.

114.    Increasing AIG's dividend had no purpose other than to further enrich Defendants –

all of whom were stockholders – at the expense of AIG.  Moreover, as set forth below, the dividend

declaration was directly tied to the desire to compensate certain Officer Defendants.

---

[4] The purposeful delay of the publication of the impaired condition of  AIG's derivatives portfolio
serves as further evidence that Defendants knew or were reckless in not knowing of the material
false and misleading statements made at the December 5, 2007 Presentation and thereafter
throughout the Relevant Period.

115.    While litigation has existed from at least 2005 regarding the ownership of at least 290 million shares of AIG common stock held by an entity called C.V. Starr[5] (an entity that is now controlled by former AIG CEO Hank Greenberg), a decision published by Judge Barbara Jones of the Southern District of New York on June 23, 2008 illuminates why Defendants were willing to and did raise – as opposed to cancel completely – the Company's dividend at the time it was being forced to sell hundreds of millions of shares of common stock, and to dilute earnings per share by almost 10% in the up-coming year.  Judge Jones's decision shows that AIG has a significant, colorable claim against Starr International Co. ("Starr"), that could result in the Company forcing Starr to continue to use the 290 million Company shares it holds, to fund a bonus pool to compensate officers of AIG (the Deferred Compensation Profit Participation Plan), as it traditionally had done pursuant to a verbal agreement since the early-1970s.

116.    While issues presented by Starr in that action were found to remain for the finder of fact, Judge Jones would not, as a matter of law, dismiss AIG's breach of fiduciary duty claim against Starr for refusing to continue to make bonus payments to Company employees, pursuant to the terms of the ownership of those shares.  Thus, it was conceivable that tens of millions of dollars associated with the payment of the augmented dividend would be channeled through Starr and back to the senior officers and possibly certain directors of AIG  Moreover, as was stated in Judge Jones's June 2008 Order, once Starr failed to contribute to the DCPPP funds, during 2006 AIG had replaced the

---

[5] While the 2008 Proxy Statement placed this number of shares at over 354.9 million shares held by Starr, the June 23, 2008 order by Judge Jones indicates that over 30 million of these shares may have been sold, and that Starr currently holds approximately 290 million AIG shares.

shares in the DCPPP, on its own, such that officers and directors of the Company had a direct interest in the increase of the dividend at that time.

117.    Increasing AIG's already expensive dividend by 10% at the same time that it was being forced to dilute shareholders and raise at least $20 billion in new equity was *not inconsistent* with the Board's pattern and practice of favoring its own interests at the expense of the Company's well being or the interests of its shareholders.

**1Q:08 Loss of $7.81 Billion: $12.5 Billion Charge for Derivatives, $15.95 Billion Total Write-downs, $12.5 Billion in Planned Stock Sales**

118.    Despite the assurances provided by Defendants in the Company's 2007 Form 10-K, and despite Defendants' prior statements concerning AIG's financial and operational condition, on May 9, 2007, when AIG announced results for 1Q:07, Defendants caused the Company to report a quarterly loss of $7.81 billion, or $3.09 per share, compared with earnings of $4.13 billion, or $1.58 per share in the year-earlier period.  According to Defendants, during 1Q:08, the Company lost $9.11 billion in its credit-default swaps portfolio in addition to a $6.82 billion loss on investments.

119.    At that time, because of the massive undisclosed liquidity crisis that existed within AIG, Defendants revealed that the Company would be forced to sell at least $12.5 billion of additional equity.  The effect of this huge equity sale would substantially dilute then current shareholders of the Company, and foreseeably would reduce earnings the following year by at least 10%.

120.    Following the publication of the first quarter 2008 results and after announcing this large equity dilution, shares of the Company fell 8.8 percent in a single day of trading, or $3.87 per share, to close at $40.28.  According to a report published in the *Wall Street Journal* on May 9, 2008, at least one analyst called these results "gruesome."

121.    In connection with the public offering of over 171 million shares of common stock priced at $38.00 per share, on May 12, 2008, Defendants caused AIG to publish a release that stated, in part, the following:

> American International Group, Inc. (AIG) announced today that it priced its $6.5 billion public offering of 171,052,631 shares of common stock at $38 per share and has granted the underwriters a 30-day option to purchase up to an additional 25,657,894 shares of common stock to cover over-allotments.
>
> In addition, AIG concurrently priced its $5.4 billion public offering of 72 million equity units, with an initial stated amount of $75 per unit. The threshold appreciation price of the equity units is $45.60, which represents a premium of 20% over the concurrent public offering price of AIG common stock of $38 per share. AIG has granted the underwriters a 13-day option to purchase up to an additional 6.4 million equity units to cover over-allotments.
>
> The combined size of these two offerings has been increased from the previously announced $7.5 billion. AIG intends to use the net proceeds from the offerings for general corporate purposes.
>
> Citi and JPMorgan are serving as joint bookrunning managers for both offerings.

122.    The decision to raise the dividend at the same time the Company was short of cash and was selling billions of dollars of stock and diluting the current shareholders of AIG was explained by defendant Sullivan during the regularly scheduled conference call for analysts and investors, held on May 9. 2008.  During this call, defendant Sullivan stated that, the decision to raise the Company's dividend at that time was "a reflection of the Board's and management's long-term view of the strength of the Company's business, earnings and capital generating power."

**Liquidity Crisis:  Equity Offering Raised to $20 Billion**

123.    Finally, on May 22, 2008, AIG revealed that, as a result of its even greater need to raise money and sustain liquidity, Defendants would cause the Company to sell at least $20 billion of

securities -- almost three times the amount originally announced. That day, Defendants caused AIG

to publish a release that stated, in part, the following:

> AIG COMPLETES ITS CAPITAL RAISING PROGRAM FOR A TOTAL OF $20 BILLION
>
> NEW YORK--May 22, 2008--American International Group, Inc. (AIG) announced today the completion of its capital raising program. The program raised a total amount of approximately $20 billion through the sale of common stock, equity units and fixed income securities. The equity units and fixed income securities receive hybrid equity treatment from the rating agencies. The total amount raised exceeded the original targeted amount of $12.5 billion due to strong demand.
>
> The capital raising program involved the public offering and sale of 196,710,525 shares of AIG common stock (including 25,657,894 shares through exercise of the over-allotment option) for $7.47 billion, and the public offering and sale of 78,400,000 equity units (including 6,400,000 units through exercise of the over-allotment option) for $5.88 billion. The total amount for these two offerings, $13.35 billion, represents an increase from the $11.9 billion announced on May 12th due to the exercise by the underwriters of the over-allotment options in full.
>
> The sale of fixed income securities totaled $6.9 billion and were issued in three series. AIG issued $4 billion 8.175% Series A-6 junior subordinated debentures; EUR 750 million 8.0% Series A-7 junior subordinated debentures (U.S. dollar equivalent of $1.16 billion); and GBP 900 million 8.625% Series A-8 junior subordinated debentures (U.S. dollar equivalent of $1.75 billion).

**Securities Fraud Action Commenced Against AIG**

124.    In another blow to the Company, on May 22, 2008, a Florida pension fund accused

AIG and a number of its top executives of understating the company's exposure to the subprime

mortgage crisis in order to inflate its stock price artificially. That day, the Jacksonville Police and

Fire Pension Fund filed a lawsuit in this District, charging fraud in connection with the disclosure of

the staggering first-quarter credit default swap loss of $7.8 billion. The Florida funds charged that

Defendants had issued false and misleading statements when they assured investors that any losses

on such credit insurance would be limited. That day, the *New York Times* quoted John Keane,

Executive Director of the Jacksonville fund who stated that, "These folks that have manipulated the market by making false statements have caused severe economic loss to the underlying trust fund which thousands of our members rely on."

125.    The lawsuit centers on comments made to investors by several AIG senior executives, who assured investors that the Company would weather the subprime crisis better than many of its peers because of its conservative and sophisticated risk management.  The suit cites a number of instances in which Company officials and the Board assigned little or no risk to AIG's credit default swap portfolio. Last December, the suit says, defendant Sullivan said the likelihood that the swaps portfolio would sustain actual losses was "close to zero."

126.    "Senior management deprived AIG investors of fundamental information demonstrating that, contrary to AIG's repeated statements that the company was well-positioned to weather the subprime storm, it was really a ticking time bomb waiting to explode because of billions of dollars in subprime-related losses," stated Gerald H. Silk, a partner at Bernstein Litowitz Berger and Grossman, the law firm that filed the suit for the pension fund, in a *New York Times* report published May 22, 2008.  The suit charges that AIG's management knew about the problems with the swaps but hid them from investors. The Company's stock, which hit a high of $72.65 last June, fell to $36.75 after the first-quarter results.

127.    Pursuant to the Private Securities Litigation Reform Act of 1995, the day this action was filed against AIG, on May 22, 2008, a notice of filing was published on *Market Wire*, a news wire service.  This notice release stated, in part, the following:

> Bernstein Litowitz Berger & Grossmann LLP Announces Filing of Class Action Suit Against AIG and Certain of Its Senior Officers and Directors
>
> Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") today announced that it

filed a class action lawsuit in the United States District Court for the Southern District of New York on behalf of its client Jacksonville Police and Fire Pension Fund ("Jacksonville Police & Fire") and purchasers of the securities of American International Group Inc. ("AIG" or the "Company") (during the period from May 11, 2007 through May 9, 2008 (the "Class Period"). The case is captioned <u>Jacksonville Police and Fire Pension Fund v. American International Group Inc., et al.</u>, Case No., 08-CV-4772.

The Complaint alleges that during the Class Period, AIG and the individual Defendants, Chief Executive Officer Martin J. Sullivan, Executive Vice President and Chief Financial Officer Steven J. Bensinger, Senior Vice President and Chief Risk Officer Robert Lewis and Joseph Cassano, the former head of AIG subsidiary American International Group Financial Products ("AIGFP"), violated the federal securities laws by issuing false and misleading press releases, financial statements, filings with the SEC and statements during investor conference calls. The Complaint alleges that, throughout the Class Period, Defendants repeatedly reassured investors that AIG had successfully insulated itself from the recent turmoil in the housing and credit markets due to its superior risk management. In particular, Defendants touted the security of AIGFP's "super senior" credit default swap ("CDS") portfolio, making numerous statements that this portfolio was secure and that AIG's method for accounting for the valuations of this portfolio accurately reflected its value.

Investors began to learn the truth regarding AIG's financial condition and the Company's exposure to the mortgage market when, on February 11, 2008, the Company disclosed that its outside auditor had determined that there was "material weakness in its internal control" over the financial reporting and oversight relating specifically to its accounting for the CDS portfolio, and that the Company was revising the loss valuations it previously reported. Under the new valuations, losses on the CDS portfolio more than quadrupled -- from the $1.4 billion reported on the CDS portfolio just weeks before to over $4.5 billion. Two weeks later, on February 28, 2008, AIG disclosed that the market valuations on the CDS portfolio would increase to $11.5 billion and revealed for the first time that the Company had notional exposure of $6.5 billion in liquidity puts written on collateralized debt obligations ("CDOs") linked to the sub-prime mortgage market. Finally, on May 8, 2008, the Company disclosed that market valuation losses on the CDS portfolio for the quarter climbed an additional $9.1 billion, for a cumulative loss of $20.6 billion, and that the Company was expecting actual losses on the portfolio to be about $2.4 billion. As a result of these disclosures, the price of AIG stock plunged from a Class Period high of $75.24 per share on June 5, 2008, to $38.37 per share on May 12, 2008, wiping out tens of billions of dollars in shareholder value and causing damage to the class.

The Complaint alleges that the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

and that Defendants Sullivan and Bensinger violated Section 20(a) of the Exchange Act.

## Possible Criminal Investigation By SEC and DOJ

128.    On June 6, 2008, *The Wall Street Journal* further reported that both the SEC and United States Justice Department had begun to scrutinize the manner in which AIG was caused to account for its derivative credit default swaps and whether the Company was caused to overstate the value of contracts linked to subprime mortgages.  According to this report, criminal prosecutors from the Justice Department in Washington and the department's U.S. Attorney's Office in Brooklyn, New York, have told the SEC they want information the agency is gathering in its AIG investigation, indicating that a criminal investigation could follow.  Officials for AIG, the SEC, the Justice Department, and the U.S. Attorney's Office declined to comment on the new probe.

129.    News of this investigation battered AIG shares, which closed on June 7, 2008 at $33.93 per share -- down an additional 7% in the single trading day -- as over twice as many shares traded than AIG's recent daily average trading volume.

130.    Following this share price decline, on June 9, 2008, *The Wall Street Journal* reported that three major shareholders of the Company, who collectively owned or controlled approximately 4% of AIG's outstanding common shares -- approximately 100 million shares --  sent what was described as a "blistering" letter to the AIG Board.   Sent by billionaire and former director Eli Broad and two major fund managers, Shelby Davis of Davis Selected Advisers LP and Bill Miller of Legg Mason Inc the letter cited "*a staggering breakdown of risk controls*" and "an *unequivocal loss of investor confidence*" and demanded that steps be taken to improve senior management and "*restore credibility*."

**Sullivan Quits and Willumstad Consolidates Control in AIG Board**

131.    On June 15, 2008, Defendants caused AIG to publish a release that announced that defendant Sullivan retired as CEO and that the Board had named defendant Willumstad, who had already been serving as Chairman of the Board, to the position of Chief Executive Officer -- thereby consolidating complete and ultimate power in the management of the Company into the hands of defendant Willumstad.  This too surprised investors, given that, as part of the 2006 settlement with N.Y. Attorney General Elliot Spitzer, the offices of Chairman and CEO were separated at AIG.

132.    At the time AIG announced that defendant Sullivan would be "leaving AIG and its Board," the Company also announced that the Board had named defendant Bollenbach as its Lead Independent Director.  In thanking Sullivan for his service to the Company, Defendants issued a release stating, in part, the following:

> George L. Miles, Jr., Chairman of the Nominating and Corporate Governance Committee of the Board of Directors, said, Martin successfully led AIG through the crisis it faced when he became CEO in 2005, and he has made significant contributions over the past three years in executing AIG's strategy and building on its global franchise. The Board has determined that Bob's broad managerial and financial services experience makes him the right person to lead AIG through today's turbulent markets, drive further organizational change and rebuild shareholder value in the years ahead.

> Miles continued, On behalf of the Board and the entire organization, I want to thank Martin Sullivan for his extraordinary dedication and service to AIG for over 35 years. We all wish him well in his future endeavors.

133.    It was later reported that, in connection with this appointment as CEO, defendant Willumstad had received a one-time grant of $24.5 million in restricted Company stock.  This was in addition to a one-time stock-option award that AIG valued at $12.0 million, an annual salary of $1.0 million per year, and a guaranteed bonus of $4.0 million in 2008.  In total, in connection with his

accession and consolidation of the office of CEO, defendant Willumstad paid consideration valued at over $40 million.*:*

## Additional Waste of Corporate Assets: Improper Severance Payments to Sullivan

134.    In addition to defendant Sullivan having received approximately $40.0 million that had been caused to be paid by AIG since he became CEO in late-2005, according to initial reports, as a result of the amicable departure of defendant Sullivan from the Company, he would be entitled to at least the following payments:

| | |
|---|---|
| Cash Severance    . . . . . . . . . . . . . | $ 15.0 million |
| Pro Rated Bonus    . . . . . . . . . . . . . | $ 3.70 million |
| Retirement Benefits    . . . . . . . . . . . . | $ 3.75 million |
| Discretionary Restricted | |
| Stock Awards    . . . . . . . . . . . . . | $ 10.9 million |
| | =========== |
| TOTAL | $33.35 million |

135.    On July 2, 2008, *The New York Times* reported that the Board of AIG paid defendant Sullivan a severance package valued at ***$47 million***.  According to the *Times* report, Sullivan received the following payments: (i) $15 million severance; (ii) $4.0 million pro-rated bonus for 2008; (iii) long-term cash awards valued at $28 million.  For 2007, Sullivan was awarded a bonus of $6.5 million, and total compensation of $14.4 million and in 2006, that figure was $21.2 million.  The *Times* also reported that the Board had characterized Sullivan's departure as having occurred for "*Good Reason*."

136.    These payments to defendant Sullivan do not appear at all consistent with the stated goal of the Compensation Committee, as reported in AIG's 2008 Proxy Statement, as follows:

AIG's compensation framework is designed to retain and motivate key employees and to reward them for both individual and AIG performance. AIG believes that the actions it has taken appropriately reflect the performance of its executive team during

2007 and provide a suitable basis for evaluating performance against the challenges of 2008.

137.     Moreover, by qualifying Sullivan's departure as for Sullivan's Good Reason -- as opposed to "Without Sullivan's Good Reason" or for "AIG's Good Reason" -- Defendants further breached their fiduciary duties to shareholders of the Company and engaged in further waste of tens of millions of dollars of AIG's assets.  According to the Company's 2008 Proxy Statement, the effect of qualifying defendant Sullivan's departure as being for "Good Reason" had the effect of causing the Company to be responsible for paying Sullivan up to $35.032 million in additional severance and bonus payments, as follows:

**Termination Payments and Benefits as of December 31, 2007**

| Name | Target Annual Bonus | Severance | Medical and Life Insurance | Pension Plan Credit | Unvested Options | Unvested Stock Awards | Unvested Senior Partner Plan Awards | Total |
|---|---|---|---|---|---|---|---|---|
| Martin J. Sullivan | | | | | | | | |
| By AIG for "Cause" | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| By Executive w/o "Good Reason" | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 |
| By Executive with "Good Reason" | $ 5,000,000 | $ 30,000,000 | $ 32,316 | $ 0 | $ 0 | $ 0 | $ 0 | $ 35,032,316 |
| By AIG without "Cause" | $ 5,000,000 | $ 30,000,000 | $ 32,316 | $ 0 | $ 0 | $ 0 | $ 0 | $ 35,032,316 |

138.     In addition to the serious breaches of many important fiduciary duties outlined herein, and in addition to the securities fraud action filed against the Company; the SEC and DOJ investigations now pending; and the total loss of confidence in AIG's management or its Board -- the price of Company shares has been decimated under Sullivan's stewardship over the Company.  The chart below evidences the dramatic decline in the price of AIG's shares during Sullivan's tenure as

CEO of the Company -- falling from approximately $70.00 per share at the beginning of January 2006 to below $26.50 by the end of June 2008 --  as follows:



**AIG Common Stock Price/Volume Chart: Date Range 1/1/06 until 6/30/08**

*This share price decline amounted to the* **_eviceration of over $110 billion_** *of AIG's market capitalization -- or over 62% of AIG's total market value.*

139.    The transfers to Sullivan were particularly egregious in that, contrary to Defendants' characterization, Sullivan did not, in fact, retire for "good reason," as that term was understood at AIG.  Pursuant to the Employment Agreement of defendant Sullivan, recited in the 2008 Proxy statement, it is obvious that Sullivan was terminated for "Cause" and not his own "Good Reason" -- which was generally defined as necessitating "any material adverse change to the executive's responsibilities or titles, any material breach by AIG of the executive's employment agreement or most relocations to the executive's primary office," as follows:

> *Employment Agreements.* As previously discussed, the Committee negotiated an employment agreement with each of Messrs. Sullivan and Bensinger in connection with their promotions in March 2005. In light of the circumstances, the Committee also believed it was important to restrict the executives' ability to compete with AIG in the event of any separation.
>
> *Severance benefits in 2007.* The two employment agreements provide for termination benefits if an executive's employment is terminated by AIG without "Cause" or by the executive for "Good Reason" during the term of the agreements. "Cause"

generally means the executive's failure to perform duties, willful misconduct or violation of AIG's codes of conduct or conviction of a felony or any lesser crime involving dishonesty. "Good Reason" generally means any material adverse change to the executive's responsibilities or titles, any material breach by AIG of the executive's employment agreement or most relocations of the executive's primary office. In the case of Mr. Sullivan, "Good Reason" also includes any failure of AIG's shareholders to re-elect him to the Board of Directors and any failure of the Board of Directors to consult with him prior to appointing any new Chairman of the Board. In those cases, subject to the executive's execution of a release of claims, the executive is entitled to the following:

- A pro rata portion of the target annual bonus;

- Severance of three times annual base salary and the prior year's annual cash performance bonus (subject to minimums of $15,000,000 for Mr. Sullivan and $7,500,000 for Mr. Bensinger) payable over 12 months;

- Three years of continued health and life insurance coverage;

- Three years of service and age credit under AIG's pension plans; and

- Enhanced eligibility for retiree medical and life insurance benefits.

The payments will cease if, before the payment or benefit is due, the Board determines that grounds existed for AIG to terminate the executive's employment for "Cause." Severance payments are not included in the calculation of any AIG pension benefit, and the executive is not entitled to receive any payment pursuant to any nonqualified AIG pension plan until the date the executive has ceased receiving severance payments.

In addition, if any amounts payable to the executive on termination are subject to an additional "golden parachute" excise tax under the Code, AIG will increase the amounts so that the executive is not affected by the tax.

### Ontario Teachers' Pension Plan Board Files Expanded Class Action

140.    On June 19, 2008, counsel for the Ontario Teachers' Pension Plan Board, who also filed suit against AIG for securities fraud, published notice that they had expanded the relevant period of their action to include November 10, 2006 though June 6, 2008.  This suit, like the Florida

Fund suit filed previously, claimed that AIG had been caused to mislead investors by publishing materially false and misleading information related to the value of its credit default swaps and other derivative instruments.

## FALSE STATEMENTS MADE TO THE SEC
## DURING THE RELEVANT PERIOD

141.    In addition to the statements made by Defendants during the December 5, 2007 Investor Presentation, later Defendants also caused to be filed with the SEC the Company's year end report, pursuant to Form 10-K, on or about February 28, 2008, and its interim report for 1Q:08, filed on or about May 8, 2008.  Those Forms, which included the Company's financial statements, were simultaneously distributed to shareholders and the public.  All such financial statements on those Forms contained materially false and misleading statements about the Company and its exposure to credit default loss, and they were also were improperly presented in violation of GAAP, due to improper accounting for the Company's credit default swaps.  Similar false and misleading information was also caused to be disseminated to AIG shareholders and the public through press releases and conference calls related to each annual and quarterly report.

142.    Each of the improper Forms 10-K and 10-Q, and any amendments thereof, were reviewed, prepared and/or endorsed by the Individual Defendants.  Since the passage of Sarbanes-Oxley, such forms have also been signed and certified as accurate by the CEO and CFO serving in that fiscal year. The following chart details Defendants responsible for reviewing, preparing and/or endorsing the forms for various years, and shows which Defendants signed and certified the Company's filings under the Sarbanes-Oxley:

| Filing Date | Filing | Signed (Certified) by Individual Defendant(s) |
|---|---|---|
|  |  | Sullivan (Certified), Bensinger (Certified), Bollenbach, |

| 2/28/2008 | 10-K | Feldstein, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Tse, Willumstad |
| 5/08/2008 | 10-Q | Sullivan (Certified), Bensinger (Certified) |

**2007 Form 10-K**

143.    The year end financial report filed with the SEC on or about February 28, 2008, pursuant to Form 10-K, reported the Basis of Presentation that Defendants were required to utilize in preparing the Company's financial statements.  Accordingly, the 2007 Form 10-K stated the method and manner in which management and the Board were required to account for AIG's Investments in Fixed Maturities and Equity Securities and Mortgage Loan Receivables, in part, as follows:

**Notes to Consolidated Financial Statements**

**1.    Summary of Significant Accounting Policies**

**(c)    Investments in Fixed Maturities and Equity Securities:**

For AIG's insurance subsidiaries, unrealized gains and losses on investments in trading securities are reported in Net investment income. Unrealized gains and losses from available for sale investments in equity and fixed maturity securities are reported as a separate component of Accumulated other comprehensive income (loss), net of deferred income taxes, in consolidated shareholders' equity. Investments in fixed maturities and equity securities are recorded on a trade-date basis.

AIG evaluates its investments for other-than-temporary impairment. The determination that a security has incurred an other-than-temporary impairment in value and the amount of any loss recognized requires the judgment of AIG's management and a continual review of its investments.

AIG evaluates its investments for other-than-temporary impairment such that a security is considered a candidate for other-than-temporary impairment if it meets any of the following criteria:

•        Trading at a significant (25 percent or more) discount to par, amortized cost (if lower) or cost for an extended period of time (nine consecutive months or

longer);

- The occurrence of a discrete credit event resulting in (i) the issuer defaulting on a material outstanding obligation; (ii) the issuer seeking protection from creditors under the bankruptcy laws or any similar laws intended for court supervised reorganization of insolvent enterprises; or (iii) the issuer proposing a voluntary reorganization pursuant to which creditors are asked to exchange their claims for cash or securities having a fair value substantially lower than par value of their claims; or

- AIG may not realize a full recovery on its investment regardless of the occurrence of one of the foregoing events.

The above criteria also consider circumstances of a rapid and severe market valuation decline, such as that experienced in current credit markets, in which AIG could not reasonably assert that the recovery period would be temporary.

At each balance sheet date, AIG evaluates its securities holdings with unrealized losses. When AIG does not intend to hold such securities until they have recovered their cost basis, based on the circumstances at the date of evaluation, AIG records the unrealized loss in income. If a loss is recognized from a sale subsequent to a balance sheet date pursuant to changes in circumstances, the loss is recognized in the period in which the intent to hold the securities to recovery no longer existed.

In periods subsequent to the recognition of an other-than-temporary impairment charge for fixed maturity securities, which is not credit or foreign exchange related, AIG generally accretes the discount or amortizes the reduced premium resulting from the reduction in cost basis over the remaining life of the security.

*    *    *

**(d)    Mortgage and Other Loans Receivable — net:** Mortgage and other loans receivable includes mortgage loans on real estate, policy loans and collateral, commercial and guaranteed loans. Mortgage loans on real estate and collateral, commercial and guaranteed loans are carried at unpaid principal balances less credit allowances and plus or minus adjustments for the accretion or amortization of discount or premium. Interest income on such loans is accrued as earned.

Impairment of mortgage loans on real estate and collateral and commercial loans is based on certain risk factors and when collection of all amounts due under the contractual terms is not probable. This impairment is generally measured based on the present value of expected future cash flows discounted at the loan's effective interest rate subject to the fair value of underlying collateral. Interest income on such impaired loans is recognized as cash is received.

144.    The 2007 Form 10-K also reported the method and manner in which management and the Board was required to account for the Company's Securities Available for Sale, held within AIG's Financial Services division, in part, as follows:

**(f)    Financial Services — Securities Available for Sale, at fair value:** These securities are held to meet long-term investment objectives and are accounted for as available for sale, carried at fair values and recorded on a trade-date basis. This portfolio is hedged using interest rate, foreign exchange, commodity and equity derivatives. The market risk associated with such hedges is managed on a portfolio basis, with third-party hedging transactions executed as necessary. Because hedge accounting treatment is not achieved in accordance with FAS 133, "Accounting for Derivative Instruments and Hedging Activities" (FAS 133), the unrealized gains and losses on these securities resulting from changes in interest rates, currency rates and equity prices are recorded in Accumulated other comprehensive income (loss) in consolidated shareholders' equity while the unrealized gains and losses on the hedging instruments are reflected in Other income.

145.    The 2007 Form 10-K also reported the method and manner in which AIG management and its Board was required to Reserve for Losses and Loss Expenses, in part, as follows:

**(x)    Reserve for Losses and Loss Expenses:** Losses and loss expenses are charged to income as incurred. The reserve for losses and loss expenses represents the accumulation of estimates for unpaid reported losses and includes provisions for losses incurred but not reported. The methods of determining such estimates and establishing resulting reserves, including amounts relating to allowances for estimated unrecoverable reinsurance, are reviewed and updated. If the estimate of reserves is determined to be inadequate or redundant, the increase or decrease is reflected in income. AIG discounts its loss reserves relating to workers compensation business written by its U.S. domiciled subsidiaries as permitted by the domiciliary statutory regulatory authorities.

146.    In addition to reporting the purported basis of the Company's financial and accounting, the 2007 Form 10-K also contained Certifications by defendant Sullivan, as CEO, and

by defendant Bensinger, as CFO, that purported to also attest to the accuracy, completeness and veracity of AIG's financial reporting and accounting, as follows:

### CERTIFICATIONS

I, Martin J. Sullivan, certify that:

1.       I have reviewed this Annual Report on Form 10-K of American International Group, Inc.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.       Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.       The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control

over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ MARTIN J. SULLIVAN

Martin J. Sullivan
President and Chief Executive Officer

## CERTIFICATIONS

I, Steven J. Bensinger, certify that:

1.    I have reviewed this Annual Report on Form 10-K of American International Group, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2008

/s/ STEVEN J. BENSINGER

Steven J. Bensinger

Executive Vice President and
Chief Financial Officer

**1Q:08 Form 10-Q**

147.    The 1Q:08 Form 10-Q, filed with the SEC on or about May 8, 2008, also reported on

the method and manner in which management and the Board was required to make key decisions

regarding the Basis of the Company's accounting and financial reporting, in part, as follows:

1.    Summary of Significant Accounting Policies

Basis of Presentation

These unaudited condensed consolidated financial statements do not include all
disclosures required by accounting principles generally accepted in the United States
(GAAP) for complete financial statements and should be read in conjunction with the
audited consolidated financial statements and the related notes included in the
Annual Report on Form 10-K of American International Group, Inc. (AIG) for the
year ended December 31, 2007 (2007 Annual Report on Form 10-K).

In the opinion of management, these consolidated financial statements contain the
normal recurring adjustments necessary for a fair statement of the results presented
herein. All material intercompany accounts and transactions have been eliminated.

\*    \*    \*

*Valuation Controls*

Senior management, independent of the trading and investing functions, is
responsible for the oversight of control and valuation policies and for reporting the
results of these controls and policies to AIG's Audit Committee. AIG employs
procedures for the approval of new transaction types and markets, price verification,
periodic review of profit and loss, and review of valuation models by personnel with
appropriate technical knowledge of relevant products and markets. These procedures
are performed by personnel independent of the trading and investing functions. For
valuations that require inputs with little or no market observability, AIG compares
the results of its valuation models to actual subsequent transactions.

148.    In addition to Certifications of Defendants Sullivan and Bensinger contained in the

2007 Form 10-K, the Company's interim report for 1Q:08, filed with the SEC on or about May 8,

2008, contained additional Certifications that also purported to also attest to the accuracy, completeness and truthfulness of A.I.G's financial reporting and accounting, as follows:

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of American International Group, Inc. (the "Company") for the quarter ended March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Martin J. Sullivan, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

      1.      The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

      2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Martin J. Sullivan
Martin J. Sullivan
President and Chief Executive Officer

Date: May 8, 2008

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of American International Group, Inc. (the "Company") for the quarter ended March 31, 2008, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Steven J. Bensinger, Executive Vice President and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

      1.      The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

      2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Steven J. Bensinger
Steven J. Bensinger
Executive Vice President and Chief Financial Officer

Date: May 8, 2008

**Remediation of Material Weakness**

149.    In addition to the other false statements which Defendants caused or allowed to be made to the public during the December 5, 2007 presentation or which Defendants caused or allowed to be filed with the SEC, at the time Defendants disclosed the Material Weakness in the Company's financial controls and procedures, on February 11, 2008, Defendants also caused AIG to report that management and the Board had *already* substantially cured these deficiencies.  Thus, from the time Defendants revealed this Material Weakness they also guided investors to believe that AIG had implemented remediation efforts necessary to address the material weakness and in controls and procedures in place and related to its accounting for its credit default swaps and derivative portfolios, were sufficient to ensure that the Company's financial statements were accurate in all material respects.

150.    As evidence of the foregoing, the 2008 Proxy, filed in April 2008, stated in part, the following:

Conclusion

Throughout AIG's remediation process, the Committee has remained focused on overseeing the significant efforts of management both in remediating the material weaknesses and in improving AIG's internal controls over its financial reporting, closing and consolidation processes and investment accounting and has received assurances from management and the Director of Internal Audit that the current substantive alternative procedures performed and compensating controls in place are sufficient to ensure that the financial statements for the year ended December 31, 2007 are accurate in all material respects. The Committee believes that management should focus AIG's remediation efforts on sustainable control processes. Management has informed the Committee that AIG intends to reduce its reliance on the manual controls that have been established. Under the direction of senior management, AIG is currently developing new systems and processes designed to allow it to rely on front-end detection and preventive controls which will be more sustainable over the long term. Management has confirmed to the Committee that it is committed to this approach, which has required (and will continue to require) significant time and effort on the part of management, the addition and retention of

qualified staff dedicated to maintaining appropriate controls and procedures and significant investment in systems and processes.

During 2008, the Committee will continue its oversight of management's efforts in improving AIG's internal control over its financial reporting, closing and consolidation processes, critical control functions and investment accounting. The Committee will also oversee management's remediation plan and activities relating to the material weakness in internal control over the valuation of the AIG Financial Products Corp. super senior credit default swap portfolio and oversight thereof. Management has assigned the highest priority to AIG's remediation efforts in this area.

Audit Committee
American International Group, Inc.

Michael H. Sutton, Chairman
Stephen E. Bollenbach
George L. Miles, Jr.
Morris W. Offit
Robert B. Willumstad, ex-officio
Frank G. Zarb, non-voting member

151.    Similar to the statements contained in the 8-K, however, the Company's 2007 year end financial report filed with the SEC pursuant to Form 10-K, and its 1Q:08 interim financial report filed with the SEC pursuant to Form 10-Q, also contained statements that advised of a material weakness at year end 2007, but that also stated that such weakness had already been remediated, through the actions taken by management and the Board.

Controls and Procedures

Evaluation of Disclosure Controls and Procedures

As of December 31, 2007 and as described under Remediation of Prior Material Weaknesses in Internal Control Over Financial Reporting below, the material weakness relating to the controls over income tax accounting no longer existed.

Notwithstanding the existence of this material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio, AIG believes that the consolidated financial statements

in this Annual Report on Form 10-K fairly present, in all material respects, AIG's consolidated financial condition as of December 31, 2007 and 2006, and consolidated results of its operations and cash flows for the years ended December 31, 2007, 2006 and 2005, in conformity with U.S. generally accepted accounting principles (GAAP).

Management's Report on Internal Control Over Financial Reporting

\* \* \*

Remediation of Prior Material Weakness in Internal Control Over Financial Reporting

AIG has been actively engaged in the implementation of remediation efforts to address the material weakness in controls over income tax accounting that was in existence at December 31, 2006. These remediation efforts, outlined below, are specifically designed to address the material weakness identified by AIG management. As a result of its assessment of the effectiveness of internal control over financial reporting, AIG management determined that as of December 31, 2007, the material weakness relating to the controls over income tax accounting no longer existed.

\* \* \*

Notwithstanding the existence of this material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio, due to the substantive alternative procedures performed and compensating controls introduced after December 31, 2007, AIG believes that the consolidated financial statements fairly present, in all material respects, AIG's consolidated financial condition as of December 31, 2007 and 2006, and consolidated results of its operations and cash flows for the years ended December 31, 2007, 2006 and 2005, in conformity with GAAP.

152.     Similarly, the 1Q:08 Form 10-Q also stated that the Company had remediated its control deficiencies and that AIG's financial results fairly and adequately represented the Company's financial condition at that time, in part, as follows:

ITEM 4.        Controls and Procedures

Notwithstanding the existence of this material weakness, AIG believes that the consolidated financial statements in this Quarterly Report on Form 10-Q fairly present, in all material respects, AIG's consolidated financial condition as of March 31, 2008 and December 31, 2007 and consolidated results of operations and cash

flows for the three-month periods ended March 31, 2008 and 2007, in conformity with GAAP. In addition, there has been no change in AIG's internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that occurred during the quarter ended March 31, 2008 that has materially affected, or is reasonably likely to materially affect, AIG's internal control over financial reporting.

## DEFENDANTS CAUSED AIG TO VIOLATE
## GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

153.    As a result of the Defendants' failure to properly value or reserve for the Company's portfolio losses and asset impairments, AIG has now been forced to record charges of almost $20 billion and it has diluted shareholders' ownership by selling an additional $20 billion in equity -- results completely at odds with the financial condition of the Company presented by Defendants at the December 5, 2007 Presentation.  Accordingly, throughout the relevant period, AIG's financial statements did not provide a fair representation of AIG's results and, therefore, Defendants presented the Company's results at the December 5, 2007 Presentation, at year end 2007. and at the end of the first quarter of 2008, in violation of GAAP and SEC rules. Those improper results were included in press releases, regularly scheduled investor conference calls, and periodic reports disseminated to the public and AIG shareholders.

154.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

155.    The fact that AIG has been caused by management and the Board to overstate tens of billions of dollars of credit derivative assets, and that management and the Board failed to disclose that AIG faced a severe credit crisis and would be forced to sell tens of billions of dollars in dilutive equity, were all material adverse events the disclosure of which were required by Defendants at the December 5, 2007 presentation.   Defendants' failure to make these disclosures, their failure to adequately reserve for foreseeable portfolio related losses, their failure to properly value the Company's assets, and the publication of materially false and misleading statements during the December 5, 2007 conference presented AIG's financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    the principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    the principle that financial reporting should provide information that is useful to present and potential investors and creditors, and other users, in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

(c)    the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

(d)    the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to management was violated.   To the extent that

management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(e)    the principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

(f)    the principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

(h)    the principle that conservatism be used as a prudent reaction to uncertainty, to try to ensure that uncertainties and risks inherent in business situations are adequately considered, was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

156.    Further, the undisclosed adverse information concealed by Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to be the type of information that is expected to be and must be disclosed.

157.    Moreover, this was exactly the type of information that Defendants stated was true, accurate and reliable at the December 5, 2007 Investor Presentation where they purported to meticulously report the values, controls and procedures purported to be utilized and in place at AIG at that time, and thereafter to repeat the veracity, completeness and accuracy of these representations within the Sarbanes-Oxley Certifications singed in conjunction with the filing of AIG's Forms 10-K and 10-Q.

158.    Moreover, it is a tacit acknowledgement of an utter lack of internal operational controls at AIG that Defendants caused the Company to record massive, multi-billion dollar charges and equity offerings only weeks after investors were told that:

(a)    AIG was not subject to the same credit exposures or risks of loss as its competitors who had already recorded massive multi-billion dollar charges during the fall and early winter of 2007, because of the sophisticated and conservative practices used to direct AIG's investments;

(b)    sufficient controls and procedures were in place at the Company to both value AIG's complex commercial derivative credit default swaps and other complex derivative instruments and to insure that AIG was properly hedged and adequately reserved so as to not be exposed to unreasonable risk of loss;

(c)    sufficient asset and portfolio valuation models were being used such that management and the Board were not substituting their subjective opinions for leading market

indicators or ignoring disagreements with counterparties over the values AIG was being caused to assign to its assets;

(d)    AIG's assets were properly valued and that the Company's reserves were sufficient such that the Company's exposure to risk of loss or actual loss was not material and not foreseeable at the time of the December 5, 2007 Investor Presentation;

> At all relevant times, significant material weaknesses existed at AIG, which far exceeded the weakness disclosed on February 11, 2008 and which were never remediated by Defendants at any time.[6]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO AIG AND ENGAGED IN CONSCIOUS MISBEHAVIOR AND RECKLESSNESS

159.    The Defendants breached their duties of loyalty and good faith by allowing or causing the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent illegal actions related to the misrepresentation.

160.    As set forth above, Defendants had a duty to AIG that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.   In order to adequately carry out this duty, it is and was necessary for the Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.   Here, this material, non-public information included: (i) the fact that the Company lacked requisite internal controls and that, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts; and (ii) the fact

---

[6] A "material weakness" is a control deficiency, or combination of control deficiencies, that results in **_more than a remote likelihood_** that a material misstatement of the annual or interim financial statements will not be prevented or detected.

that the Company's financial statements were materially misstated due to, among other things, Defendants' failure to ensure that the Company's credit default swap contracts were valued properly, and that AIG was adequately reserved to cover foreseeable losses related to these portfolios.

161.    Furthermore, the Director Defendants, as members of the respective committees of the Board, had special duties that included knowing and understanding the material information as set out in the charters of each of the respective committees, which provides that each committee's responsibilities include: (i) overseeing evaluation of the Company's internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards and principles; and (iii) overseeing internal audits.  It was also the duty and responsibility of the Audit Committee to communicate the results of its exercise of reasonable judgment to the full Board of Directors and for the full Board to ultimately monitor and oversee the Audit Committee itself.

162.    The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants had a duty to discuss this material information with management and fellow directors at any of the Board's meetings or at any of the meeting of the committees of the Board.

163.    Despite these duties, the Defendants caused the materially false and misleading statements complained of in part herein, to be made and disseminated to investors at the December 5, 2007 Investors Presentation and thereafter throughout the remainder of the Relevant Period in 2008.

164.    The Defendants' conduct as set forth herein constituted conscious misbehavior and recklessness.  Each of the Officer Defendants was charged with overseeing the risk, valuation,

and integrity of the CDS portfolio at AIG, and each of the Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the CDS portfolio: (a) Bollenbach, Miles, Offit, Sutton, Willumstad (Audit); (b) Futter, Miles, Orr, Rometty, Willumstad (Nominating and Corporate Governance); (c) Langhammer, Orr, Rometty, Willumstad (Compensation and Management Resources); (d) Feldstein, Langhammer, Offit, Sullivan, Willumstad (Finance); (e) Holbrooke, Miles, Offit, Willumstad (Public Policy and Social Responsibility); and (f) (Bollenbach, Feldstein, Futter, Sutton, Willumstad (Regulatory, Compliance and Legal). Each of these Committees did, in fact, actively direct and control the Company's affairs during the Relevant Period. In 2007, for example, the Audit Committee met 14 times, the Nominating Committee met 6 times, the Compensation Committee met nine times, and Finance Committee met 10 times, the Public Policy Committee met four times, and the Regulatory Committee met six times – for a total of 49 meetings of Board committees alone in 2007.

165.    Moreover, from the time of the December 5, 2007 Presentation and thereafter, Defendants also knew that AIG was a company lacking leadership at the executive and Board level, and was a company with an utter lack of internal controls with regard to its accounting practices and procedures. These deficient controls included, among other things: (i) the utilization of valuation methodologies that were admittedly improper and overly subjective; (ii) allowing management and the Board to ignore obvious red flags which provided data that contradicted the inflated valuation that Defendants applied to AIG's derivatives portfolio; (iii) failing to ensure that the Company's financial results and guidance were made in accordance with Generally Accepted Accounting

Principles; and (iv) failing to insure that AIG management and the Board would not be allowed to favor their own financial interests at the expense of the best interest of the Company and its shareholders.

166.    In addition to the tens of millions of dollars in unreserved asset impairment charges and the hurried sale of $20 billion in new dilutive equity, and also in addition to the almost $110 billion in market value reduction caused as a result of investors learning the true impaired condition of AIG, as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class-action lawsuits that allege violations of federal securities laws.  These actions have cause and will continue to cause AIG to expend significant sums of money and will cause an additional distraction to an already beleaguered management and Board trying to run AIG.  Such expenditures include, but are not limited to the following:

(a)    costs incurred in connection with the SEC investigation, internal investigations, and defending AIG and certain officers in shareholder actions, which are expected to exceed tens or hundreds of millions of dollars in legal fees and settlement costs;

(b)    costs incurred to correct the material understatement of the Company's assets and regular reliance on erroneous, manual valuation analysis, especially during the critical period when market volatility was causing an extreme devaluation of the collateral supporting billions of dollars in portfolio assets;

(c)    costs incurred from directing manpower to correct the Company's defective internal controls, including but not limited to costs incurred in lost productivity as the attention of

directors, officers and employees are diverted from normal Company business to the issues raised by the SEC investigation, other potential investigations, litigation and related bad publicity;

(d)    potentially tens of millions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(e)    costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the improper financial statements and illegally manipulated stock-option grants;

(f)    costs incurred from potential losses of large customers who do not want to be associated with businesses that improperly manage their accounting; and

(g)    costs of additional downgrades of AIG's debt and securities by financial analysts and creditors, due to concerns about the Company's financial reporting.

167.    The Defendants' actions have irreparably damaged AIG's corporate image and goodwill.  For at least the foreseeable future, AIG will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public. Because of the "liar's discount," investors and lenders are less likely to give AIG equity capital or loans on favorable terms in the future.

## DERIVATIVE ALLEGATIONS

168.    Plaintiffs bring this action derivatively in the right and for the benefit of AIG to redress injuries suffered, and to be suffered, by AIG as a direct result of the breaches of federal and state law, fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  AIG is named as a

nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

169.    Plaintiffs will adequately and fairly represent the interests of AIG in enforcing and prosecuting its rights.

170.    Plaintiffs are and were owners of the stock of AIG during times relevant to the Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

129.    Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

### PRE-SUIT DEMAND IS FUTILE AND THEREFORE EXCUSED

171.    Demand upon the Board of AIG that they institute this action in the company's name would be entirely futile, and is therefore excused.

172.    The Board of AIG consists of thirteen (13) individuals: Defendants Willumstad, Bollenbach, Johnson, Feldstein, Langhammer, Miles, Offit, Orr, Rometty, Sutton, Tse, Futter, and Holbrooke. A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein:

    a.    Willumstad and Tse are high-level executive officers of AIG and the Company has conceded that they are not independent under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.

    b.    Johnson holds a vice chairman position with Goldman Sachs, which is a primary counterparty to AIG in the swap transactions at issue. As reported by the *Wall Street Journal* and other sources, both the SEC and the DOJ in June 2008 began an investigation as to whether AIG properly valued its swaps. The investigations were prompted by valuation disputes between AIG and its counterparties, including Goldman

Sachs. By virtue of her high-level position with Goldman Sachs, Johnson cannot be expected to be impartial and, in fact, is <u>doubly</u> conflicted from doing so.

  c.  AIG has made large payments to charities and other organizations with which several Board members are affiliated, including Bollenbach, Feldstein, Langhammer, Offit, Futter, and Holbrooke, precluding them from being disinterested and independent. In one particularly egregious example, starting in 2007 the Company made payments of no less than $577,500 to the "Asia Society," of which Holbrooke is chairman of the board of directors, for various membership fees and sponsorship costs. These transfers redounded solely to Holbrooke's benefit.

  d.  Rometty is the Senior Vice President of IBM Corporation, which has engaged in multiple transactions with AIG, thus putting Rometty on both sides and seriously impairing her independence.

  e.  Willumstad, Langhammer, Rometty, and Orr sit on the Company's Compensation and Management Resources Committee, which approved each of the wasteful, unearned transfers to all Defendants.

  f.  In 2007, the Company bestowed no less than $89,540 worth of perks on Tse, including a dedicated car and driver, financial and tax planning, personal uses of country club memberships, housing, home security, and various "living expenses."

173.  In addition, while AIG and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct.

These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their incompetent performance and deceptive activities.

174.    As a result of their concealments and falsifications, many of the directors and managers of AIG held onto their positions of power, prestige and profit at the Company. Those – such as defendant Sullivan – who were awarded with bonuses and severance packages in tens of millions of dollars.  Other directors, such as defendant Willumstad, took advantage of the chaotic environment which the Board's lack of leadership had caused and consolidated the managerial powers of AIG back within the Board of Directors.

175.    This, too, explains why Defendants had waited until after the Board completed its 2007 performance reviews in January 2008 and set bonus payments for 2007, before disclosing in mid and late-February 2008 that AIG would be forced to take massive charges and issue tens of billions of dollars in dilutive equity.  The managers of AIG obtained millions of dollars of salaries and bonuses which would have been denied them had the true financial condition of the Company been disclosed.  Thus, the directors have avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

176.    The AIG Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of AIG or its shareholders.  The present Board of Directors of AIG has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

        a.    The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

b.       Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

c.       The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

d.       In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

e.       The members of the AIG Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of AIG. They have thus benefited from the wrongs alleged herein and have engaged to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

f.    The AIG directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability; They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

177.    In addition to the foregoing, the present Board of Directors of AIG have refused, and will continue to refuse to institute this action because they face debilitating conflicts of interest as a result of their direct complicity in the actions complained of herein, the benefits that they received therefrom, and also as a result of their membership on committees of the Board directly responsible for oversight of the Company.  In addition, demand on the Board of Directors of AIG must also be excused for the following reasons, among others:

a.    Defendant Willumstad will take no action against the remainder of the AIG Board, and they will take no action against him, because defendant Willumstad is the Chairman of the Board of Directors and now also serves as Chief Executive Officer of AIG, and defendant Willumstad has dominated and now continues to dominate and control the Company as a result of his joint roles as the senior most executive officer and leading Board member of the Company;

b.    Defendant Willumstad will also take no action against the remainder of the AIG Board because, in connection with his ascendancy to the position of CEO, in

addition to his prior position as Chairman of the Board, defendant Willumstad was also paid options and stock grants valued at $40 million. Having taken advantage of the disruption caused as a result of the lack of leadership that he and the Board fostered, and having been rewarded with tens of millions of dollars of unearned compensation and complete hegemony over AIG, defendant Willumstad will take no action against the Board. Conversely, the members of the Board will take no action against defendant Willumstad because, in conjunction with defendant Willumstad, the members of the Board have also assumed complete control over the Company;

c.     Defendants will also take no action against one another or against any member of the Board because each member of the Board received hundreds of thousands of dollars per year in compensation in exchange for their purported trust, loyalty and fidelity and as compensation for serving as a member of the Board and as member of the committees thereof. Accordingly, Defendants will take no action against themselves or the other members of the Board of Directors of AIG, because doing so would result in the loss of compensation at least as follows: (i)  over $435,000 in fees, stock awards and other compensation paid to defendant Willumstad during 2007; (ii) over $300,000 in fees, stock awards and other compensation paid to defendant Sutton during 2007; (iii) almost $300,000 in fees, stock awards and other compensation paid to defendant Miles during 2007; over $300,000 in fees, stock awards and other compensation paid to defendant Offit during 2007; almost $270,000 in fees, stock awards and other compensation paid to defendant Orr during 2007; almost $278,000 in fees, stock awards and other compensation paid to defendant Langhammer during 2007; almost $254,000 in fees, stock awards and other compensation

paid to defendant Feldstein during 2007; almost $254,000 in fees, stock awards and other compensation paid to defendant Rometty during 2007; and defendant Tse also received over $9.998 million in salary and bonuses;

d. As members of the Audit Committee, Defendants Sutton (Chairman), Bollenbach, Miles, Offit, and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Audit Committee Charter as specified herein *supra*, by failing to cause AIG to properly account, value and reserve for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

e. As members of the Finance Committee, Defendants Offit (Chairman), Feldstein, Langhammer and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Finance Committee Charter and specified herein *supra*, by failing to cause AIG to properly account, value and reserve for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

f. As members of the Regulatory, Compliance and Legal Committee, Defendants Bollenbach (Chairman), Feldstein, Sutton, and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because

each member of this Committee breached important specific duties outlined in the Regulatory, Compliance and Legal Committee Charter and specified herein *supra*, by failing to cause AIG to properly account, value and reserve for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

g.      As members of the Compensation and Management Resources Committee, Defendants Orr (Chairman), Langhammer, Rometty, and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Compensation and Management Resources Committee Charter and specified herein *supra*, by failing to cause AIG to properly account, value and reserve for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

h.      As members of the Nominating and Corporate Governance Committee, Defendants  Miles (Chairman), Orr, Rometty, and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Nominating and Corporate Governance Committee Charter and specified herein *supra*, by causing or allowing AIG to pay tens of millions of dollars in bonus payments and severance awards to reward Defendants for failing to cause AIG to properly account, value and reserve

for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

i.    As members of the Public Policy and Social Responsibility Committee, Defendants Miles, Offit, and Willumstad will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Public Policy and Social Responsibility Committee, Charter and specified herein *supra*, by failing to cause AIG to properly account, value and reserve for losses in its credit default swaps and derivatives portfolio, and by causing or allowing AIG to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

j.    Defendant Johnson will take no action against the other members of the Board of Directors of the Company because she was granted entry to the Board on July 16, 2008, immediately after the Board granted defendant Sullivan over $47 million in severance payments and only two days before the Board granted defendant Willumstad at least $24.5 million in one time stock grants and options awards. Defendant Johnson was placed on the AIG Board at that specific time in an effort to create the illusion of legitimacy behind such massive and illicit payments, and her presence on the Board only serves as a reminder of the illegal acts and conduct complained of herein.

178.    Finally, demand upon the Board of AIG that that they sue themselves for the damage that their misconduct has caused the Company would prove futile and useless, and it is obvious that

Defendants will not do so, and they have not done so. A primary reason that the directors will not sue themselves is that by suing themselves, these individuals would void any directors' and officers' liability insurance coverage otherwise available to them, as such policies include the so-called "insured vs. insured" exclusion, by which a suit brought by or on behalf of the Company against them would not be covered by the insurance and thus would expose these individuals to ruinous personal liability.

179.    Plaintiff has not made any demand on any shareholders of AIG to institute this action since such demand would be a futile and useless act for the following reasons:

a.    AIG is a publicly traded company with approximately 2.60 billion shares outstanding that traded on the NYSE throughout the relevant period, which shares were held by thousands of shareholders located throughout the nation and abroad;

b.    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

180.    At all relevant times, as a result of their membership in the Board, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, the Defendants each had access to internal corporate documents, conversations, and connections with other corporate officers and

employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.

181.    Accordingly, and because of their positions of trust, loyalty, and fidelity to AIG, Defendants knew or should have known:  (a) the adverse, material information about the business of AIG that they failed to disclose to the investing public, which subjected the Company to lawsuits by and ultimately huge damages paid to shareholders; (b) the true state of affairs at AIG as to which they caused the Company to affirmatively offer false and misleading guidance to investors (including the dissemination of false press releases and false filings with the SEC throughout the Relevant Period, as well as the false statements and guidance promulgated at the December 5, 2007 Investor Presentation); (c) the nature of their fiduciary duties to AIG, including the elaborate, duties that the Company required of them, and their active breach of those very same duties; (d) the absence of any meaningful internal controls and procedures that would have prevented the Company's massive financial exposure to the subprime credit meltdown, as well as the violation of the Company's existing internal controls (to the extent those controls might have mitigated the Company's risk); (e) the waste of Company assets represented by AIG's decision to expose itself to the subprime credit markets; and (f) the conflicts of interests among themselves which caused Defendants to act in their own self-interest and contrary to the interests of AIG.

182.    At all relevant times, the Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) enhance the Defendants' directorial and managerial positions at AIG, as well as the power and prestige accruing to Defendants as a result of holding those positions, and transfer exorbitant unearned and wasteful sums of money to themselves; (b) expose AIG to a grossly wasteful and massively risky investment strategy that they

knew or should have known would expose the Company to *tens of billions of dollars' worth of losses* and jeopardize its very existence; (c) conceal the fact that the Company was grossly misrepresenting its financial results in order to allow Defendants to artificially inflate the value of AIG's derivative portfolio and to underreport loss reserves at least long enough to allow the Compensation Committee of the Board to complete its 2007 performance reviews, which were concluded in January 2008, and award Defendants substantial bonuses and other compensation; and (d) otherwise deceive the investing public, including AIG's own shareholders, as to the Defendants' management of AIG's operations, the Company's financial health, stability, the accuracy and integrity of its accounting policies and other internal controls, and its and business prospects, exposing the Company to massive damages and incalculable reputational loss among its actual and potential customers and investors.

183.    In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.

184.    At all relevant times, each of the Defendants was the agent of each of the other Defendants and was at all times acting within the course and scope of such agency.

185.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary

wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

186.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least December 5, 2007 and continuing thereafter regarding the improper valuations of AIG's investment and derivatives portfolios as well as the Company's financial statements and other statements regarding AIG's performance and financial condition, as well as misstatements regarding AIG's accounting and financial statements, discussed herein.  During this time, Defendants caused AIG to conceal the true fact that Defendants had caused the Company to misrepresent its financial results and over-reporting the value of its assets by tens of billions of dollars.  In addition, Defendants also made specific, improper statements about AIG's financial performance and its future business prospects during the December 5, 2007 presentation, and thereafter as alleged herein.  Those improper statements included Defendants' failure to disclose information about AIG's asset impairments and internal control problems, as well as the over-statement of AIG's revenues, derivatives portfolio values and its under-reporting of charge-offs, costs and expenses.

187.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of AIG common stock so they could: (i) coordinate the Board's hegemony over AIG, and consolidate the managerial powers over the Company in the hands of Willumstad and the Board that promoted him to CEO; (ii)

usurp tens of millions of dollars in unearned bonus and severance payments, and to waste hundreds of millions more in corporate pay-outs and excessive dividends -- much of which was paid back to AIG's directors and managers through the DCPPP bonus pool accounts; and (iii) protect and enhance Defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## CLAIMS FOR RELIEF

### COUNT I

#### Against All Defendants for Breach of Fiduciary Duties

188.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.    Defendants owed and owe AIG fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed and owe AIG the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

190.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

191.    Each of the Defendants had actual or constructive knowledge that Defendants had caused the Company to improperly misrepresent its financial results and failed to correct the Company's grossly inaccurate publicly-reported financial results and guidance.  The facts establishing each Defendant's knowledge of both AIG's inaccurate financial results include:  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

192.    Defendants consciously failed to implement an effective system of internal controls over losses in the CDS portfolio and/or consciously failed to oversee the operations of such control systems.  The facts establishing each Defendant's knowing disregard of these issues include:  (a) Defendants' complete inability to effectively address challenges from audience members as to CDS portfolio valuation during the December 5, 2007 Investor Presentation; (b) Defendants' admission that AIG had secretly used a knowingly unreliable valuation technique to calculate CDS portfolio losses for purposes of the Presentation; and (c) Defendants' assurances, later admitted to be false, that the Company had cured all material weaknesses in its CDS accounting procedures.  As a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

193.    Defendants knowingly caused or allowed the Company's financial statements to be materially misstated due to Defendants' failure to properly value AIG's credit default swap and derivatives portfolios at the December 5, 2007 Investor Presentation.

194.    Defendants failed in good faith to supervise, and to exert internal controls over,  and consciously disregarded responsibilities involving the Company's derivatives portfolio, and allowed AIG to ignore many red flags and warnings that existed and that should have caused Defendants to limit or reduce the Company's exposure to risk of loss and ultimately to tens of billions of dollars of unreserved losses.

195.    Defendants knowingly caused or allowed AIG's financial statements to be materially misstated due to their causing or allowing AIG to adopt and rely on subjective valuation methodologies across a number of important investment portfolios, during the critical period when Defendants held the December 5, 2007 Investor Presentation.

196.    Defendants knowingly caused or allowed the Company's derivatives portfolio to be overstated from at least the time of the December 5, 2007 Investor Presentation, when these assets had already suffered tens of billions of dollars of impairments and losses.

197.    To the extent they caused AIG to over-value its derivatives portfolio at the December 5, 2007 Investor Presentation, Defendants also knowingly caused AIG's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

198.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, AIG has sustained significant damages.  As a result of the misconduct alleged herein, each of the Defendants is liable to the Company.

199.    The Retirement System on behalf of AIG has no adequate remedy at law.

## COUNT II

### Against All Defendants for Abuse of Control

200.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AIG, for which they are legally responsible. Among these abuses of control were:

(i)    Defendants' failure to in good faith supervise and exert internal controls over, and their conscious disregard of responsibilities involving, the valuation of the Company's derivatives and investments portfolios; and their knowing failure to disclose the true accounting, operational and financial condition of the Company;

(ii)     Defendants knowingly causing or allowing AIG to prepare and publish financial statements that were materially misstated due to Defendants' reliance on subjective asset valuation methodologies that were at odds with many leading indicators and other available empirical data – such as counterparty valuations for the same collateral.  These assumptions were also adopted by the Board and conveyed to investors during the critical period when Defendants hosted the December 5, 2007 Investor Presentation; and

(iii)     Defendants knowingly causing, allowing and/or arranging the payment of tens of millions of dollars more in improper bonus and severance payments – predicated upon the material, adverse, non-public information about the Company's accounting problems – and paid in violation of AIG's stated compensation policies and procedures.

202.     As a direct and proximate result of Defendants' abuse of control, AIG has sustained significant damages.

203.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

204.     The Retirement System on behalf of AIG has no adequate remedy at law.

## COUNT III

### Against All Defendants for Gross Mismanagement

205.     The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

206.     By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of AIG in a manner consistent with the operations of a publicly held corporation.

207. Defendants caused or allowed AIG to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

208. Defendants caused or allowed the Company's financial statements to be materially misstated due to Defendants' failure to properly value AIG's investment portfolios, or to properly reserve for or hedge against foreseeable loss.

209. Defendants caused or allowed AIG's financial statements to be materially misstated due to regular reliance on subjective valuation methodologies which disregarded obvious negative warning signs in important leading indicators, and which ignored and diminished contrary pricing data supplied by counterparties, and other red-flags, and encouraged investors to rely on erroneous valuation assumptions during Defendants' December 5, 2007 Investor Presentation.

210. Defendants, who were senior officers or members of the Board of Directors and/or members of the Committees of the Board, and particularly the members of the Finance Committee, the Audit Committee and the Regulatory, Compliance, and Legal Affairs Committee, did not take seriously their primary responsibility for the Company's financial stability or the veracity of its reports and statements, and have attempted to shift blame for AIG's massive unreserved losses and liquidity crisis on defendant Sullivan – whom the Board paid off handsomely to leave AIG in disgrace at a time when the Company was in financial turmoil following only two years of his leadership, falsely designating his departure as one for "Good Cause," which designation allowed him to personally benefit by tens of millions of dollars in unearned severance and bonus payments.

211.    Based on the foregoing, Defendants caused or allowed AIG's financial statements to be materially misleading and not prepared in accordance with GAAP principles during the Relevant Period.

212.    As a direct and proximate result of Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, AIG has sustained significant damages in excess of hundreds of millions of dollars. In fact, AIG's market capitalization was reduced by over *$50 billion* during the very short time period that makes up the Relevant Period of this action.

213.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

214.    The Retirement System on behalf of AIG has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

215.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

216.    As a result of the improper accounting, by failing to properly consider the interests of the Company and its public shareholders, and by failing to conduct proper supervision, Defendants have caused AIG to waste valuable corporate assets by paying incentive-based bonuses and unearned severance payments in addition to securing huge eight-figure bonuses paid to Board members in connection with the consolidation of all management power in the hands of the AIG Board.  In addition to acting recklessly or negligently and without regard to the financial condition of the Company, Defendants also raised AIG's dividend at a time when the Company was undergoing a liquidity crisis and when it was caused to sell at least $20 billion in dilutive equity.

217.    Defendants were willing to and did cause AIG to engage in this massive waste of corporate assets and raise AIG's dividend payment by 10% at a time when the Company could clearly not afford to pay any dividends, because this afforded Defendants a means of channeling hundreds of millions of dollars of Company assets into dividends paid on shares of AIG held by C.V. Starr, for the benefit of the Company's officers and directors.

218.    As a result of the foregoing, AIG has been caused to incur potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions, including potentially large civil fines related to the SEC and DOJ investigations and even larger civil judgments or settlements of the securities fraud class actions that have now been filed against the Company.

219.    As a result of the waste of corporate assets, Defendants are liable to the Company.

220.    The Retirement System on behalf of AIG has no adequate remedy at law.

### COUNT V

### Against All Defendants for Unjust Enrichment

221.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of AIG.

223.    The Retirement System, as a shareholder and representative of AIG, seeks restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants and each of them from their wrongful conduct and fiduciary breaches.

224.    The Retirement System on behalf of AIG has no adequate remedy at law.

### COUNT VI

### Derivatively Against All Defendants for Violation of § 10(b)
### of the Exchange Act and Rule 10b-5 Promulgated Thereunder

225.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226.    At the December 5, 2007 Investor Presentation, Defendants disseminated or approved the dissemination of critical information that was designed to and which did condition investors to believe that AIG was performing according to plan, and that AIG would foreseeably continue at its projected rate of growth and profitability.  At that time, Defendants also conditioned investors to believe that AIG was unlike its competitors and that it was not suffering from the same adverse

market conditions that were already impacting AIG's competitors, and leading them to take large multi-billion dollar write downs in the fall of 2007. Accordingly, at the time of the December 2007 Investor Presentation, Defendants disseminated or approved the financial statements that did not disclose an of the accounting inaccuracies and internal control problems at AIG, enumerated above.

227. Specifically, AIG's financial statements included financial results that did not properly valued the Company's assets or reserve for its foreseeable losses as required by GAAP. Defendants knew or recklessly disregarded the fact that the Company's financial statements were misleading due to Defendants' improper accounting for AIG's derivatives and investment portfolios, and its false financial statements failed to disclose the material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

228. Moreover, by causing or allowing AIG to postpone even beginning to report the impaired financial and operational condition of AIG until mid-February 2008, Defendants were also complicit in delaying the publication of the true, impaired condition of the Company until after the Compensation Committee of the Board of Directors had concluded its year-end 2007 performance reviews, which were purported to occur in January 2008. This delay caused or allowed Defendants to approve tens of millions of dollars in unearned performance based compensation to the senior officers and directors of the Company.

229. Defendants had the motive and opportunity to commit fraud. By virtue of their positions of control over the entire management of the Company, the Director Defendants had unquestioned opportunity to issue statements that they knew were false and misleading. Each of the Officer Defendants had direct operative control over the Company's investments and obligations in

CDSs and similar derivative instruments. Each of the Defendants had the motive to mislead investors as to the Company's true exposure to these instruments, because, among other things:

(a) During 2007, each of the Officer Defendants wanted to paint a picture of AIG as being as profitable as possible so as to ensure the maximum possible bonus and other performance-based compensation for the 2007 fiscal year; accordingly, each of these Defendants was motivated to conceal the discrepancies in values of the CDSs and value them in a way that minimized the losses to AIG regardless of the accuracy, true future value, and risk of default of those instruments;

(b) Throughout the Relevant Period, each of the Defendants, by virtue of being a shareholder of AIG, was motivated to understate the losses from CDSs at the Company in order to benefit from the payment of dividends that the Company was to make in early 2008, dividends which were grossly inappropriate in light of the true features of the CDS portfolio and which Defendants well knew;

(c) Each of the Officer Defendants was additionally motivated to distort information so as to enable AIG to pay dividends to shareholders, because such dividends would be paid to one particular shareholder, C.V. Starr, and help fund a bonus pool to be paid by C.V. Starr to these Defendants; and

(d) Defendants were motivated to overstate AIG's financial results, and keep its stock price high, so as to protect their positions of power, authority, prestige, and personal remuneration at the Company, including out-sized salaries, directors' fees, stock awards, and other emoluments worth multiple millions of dollars to <u>each</u> Defendant and to some, *tens of millions of dollars*.

230. Also, by delaying the disclosure of the Company's investment and portfolio losses, Defendants were able to cause AIG to increase the amount of its dividend -- prior to the time that the full impairment of the Company's credit default swaps or the need to raise at least $20 billion through the sale of new equity became disclosed. Defendants expected to benefit directly from the increase in AIG's dividend because at least 290 million shares of Company stock held by shareholder C.V. Starr received dividend payments and was foreseeably required to apply such dividends to the Company's DCPPP bonus pool, for the benefit of the officers and directors of the Company.

231. Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon AIG and others in connection with their purchases of AIG common stock during the Relevant Period.

232. As a result of Defendants' misconduct, AIG has suffered and will suffer damages in that it paid artificially inflated prices for AIG common stock purchased on the open market. AIG would not have purchased AIG common stock at the prices it paid had the market been aware that the market price of AIG's stock was artificially and falsely inflated by Defendants' misleading statements. As a direct and proximate result of these Defendants' wrongful conduct, AIG suffered

damages in connection with its purchases of AIG common stock during the relevant period. By reason of such conduct, Defendants are liable to the Company pursuant.

233.    The Retirement System on behalf of AIG has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, the Retirement System demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, and violations of federal law;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants so as to assure that the Retirement System on behalf of AIG has an effective remedy;

C.    Declaring that the Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding AIG damages;

D.    Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, severance, and other illicit transfers – as well as any assets or property acquired with such payments – be held in constructive trust for the Company's benefit;

E.    Awarding to AIG restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

F.     Directing AIG to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AIG and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(ii)     control and limit improper payments of unearned compensation, corporate benefits, bonuses or severance payments;

(iii)     a provision to permit the shareholders of AIG to nominate at least three candidates for election to the Board; and

(iv)     appropriately test and then strengthen the internal audit and control functions demanded herein.

G.     Awarding the Retirement System the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.     Granting such other and further relief as the Court deems just and proper

## JURY DEMAND

The Retirement System demands a trial by jury.

Dated: August 6, 2008

KAHN GAUTHIER SWICK, LLC

_____

Kim E. Miller (KM-6996)
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis S. Kahn
Albert M. Myers (AM-2750)
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Attorneys for Plaintiff the Louisiana Municipal Police Employees' Retirement System*